**MARATHON CORPORATION d/b/a Honda–Suzuki North, Petitioner,**

v.

**John PITZNER, a mentally incompetent person, by and through his next friend and guardian, Steven Pitzner, Respondent.**

No. 01–0870.

Supreme Court of Texas.

May 22, 2003.

Rehearing Denied July 3, 2003.

Clay E. Coalson, Meredith Donnell & Abernethy, P.C., Gregory T. Perkes, The Perkes Law Firm, P.C., Corpus Christi, Rodney W. Sipes, Law Offices of Rodney W. Sipes, Edinburg, Philip S. Gordon, Gordon Law Firm, Houston, for Petitioner.

Juan A. Magallanes, Gilberto Hinojosa and Richard Otto Burst, Magallanes & Hinojosa, P.C., Brownsville, for Respondent.

PER CURIAM.

John Pitzner, an air conditioning repairman, sued Marathon Corporation d/b/a Honda–Suzuki North to recover damages for injuries he alleges he sustained when he fell from the roof of the building Mara-

thon occupied as a tenant. The trial court rendered judgment on a jury verdict in Pitzner's favor, and the court of appeals affirmed.[1] Because Pitzner failed to produce legally sufficient evidence that the alleged premises defects proximately caused his injuries, we reverse the court of appeals' judgment and render judgment that Pitzner take nothing on his claims against Marathon.

Marathon owned a Honda and Suzuki motorcycle dealership and leased the building from which Pitzner fell. Pitzner worked as an air conditioning repairman for a company owned by Robert S. Hull. Hull's company had serviced the two air conditioning units on the roof of Marathon's premises for many years before Pitzner's fall. Pitzner himself had been the primary repairman to work on the units for about two and a half years and had been on the roof of Marathon's premises at least twenty-five and perhaps as many as fifty times before sustaining his devastating injuries.

Pitzner's fall occurred on a summer day when the temperature was about ninety-nine degrees. The roof was flat and made of asphalt. Pitzner had begun work late in the afternoon. At about 6:30 p.m., Marathon's employees closed the dealership and left. They knew that Pitzner was on the roof but did not tell him that they were leaving. Pitzner was well-acquainted with the employees from previous service calls, and in the past when he needed access to the inside of the building, he would tell someone at Marathon. He had not told them that day that he needed to go inside the building or that they should stay late, as they had sometimes done.

About two hours after Marathon's employees closed the dealership and left, Pitzner was found semi-conscious in the parking lot with severe head injuries. It is undisputed that he had used a ladder to access the roof of the building, which was about twelve feet, ten inches high, but the ladder was missing when Pitzner was found. There was no other access to the roof, from either inside or outside the building. A screwdriver with a burnt tip was found near Pitzner in the parking lot, but there were no burns on Pitzner or other indications of contact with electricity. He suffered injuries to both the front and back of his head and to his lumbar spine.

The occurrence was initially reported as an assault, with the treating emergency room physician and a paramedic noting in their respective reports that Pitzner suffered from numerous blows to the head with a blunt object or appeared to have been beaten up. The investigating police officer disagreed, however, and surmised that Pitzner had fallen from the building. Because of the severity and extent of his injuries, Pitzner does not recall what happened.

Pitzner's guardian and next friend brought suit on his behalf against a number of defendants, including Marathon. Although Pitzner was a resident of Dallas County, and his injuries occurred there, suit was filed in Hidalgo County. Marathon filed a motion to transfer, which was overruled. By the time of trial, all other defendants had settled, and Marathon was the only remaining defendant.

At trial Marathon posited that Pitzner may have become dizzy or faint from working on the asphalt roof in the heat without any water. Photos and other evidence showed that Pitzner did not have any water with him on the roof. Marathon also suggested at trial that Pitzner had been the victim of foul play. Pitzner's witnesses disagreed and opined that Mara-

---

1.  55 S.W.3d 114.

thon or the condition of its premises was responsible. An expert witness testified that, in his opinion, based on the injuries to Pitzner's skull and spine, Pitzner was traveling backwards when he left the roof, and his upper body struck the ground first. He also said that, in his opinion, Pitzner received an electrical shock or "a sensation that surprised him," and that he reeled backwards, tripped over a gas line on the roof, and fell from the building.

At trial the jury was instructed that "negligence" with regard to Marathon meant:

(1) That at the time of the occurrence in question there was a dangerous condition on the premises which presented an unreasonable risk of harm to John Pitzner; and,

(2) That prior to the occurrence in question, Marathon Corporation d/b/a Honda–Suzuki North knew or should have known by the exercise of ordinary care about said condition; and

(3) That Marathon Corporation d/b/a Honda–Suzuki North, did not exercise reasonable care to reduce or eliminate the risk.

The jury found Marathon one hundred percent liable for Pitzner's injuries, and the trial court rendered a judgment for $7,731,152.59 in actual damages, including pre-judgment and post-judgment interest. The court of appeals affirmed that judgment.

In this Court, Marathon raises a number of issues, including whether: (1) it owed a duty to Pitzner; (2) it exercised control over Pitzner's work when its employees closed the dealership and left Pitzner on the roof; (3) it had actual or constructive knowledge of premises defects; and (4) any premises defects proximately caused Pitzner's injuries. Marathon also asserts that various determinations regarding its motions to transfer and for a new trial were erroneous. We address only the proximate cause issue.

■■■ The components of proximate cause are cause in fact and foreseeability.[2] The test for cause in fact, or "but for causation," is whether the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred."[3] A finding of cause in fact may be based on either direct or circumstantial evidence,[4] but cannot be supported by mere conjecture, guess, or speculation.[5]

■■■ Marathon contends that there is legally insufficient evidence to support the finding that Pitzner's injuries were caused by premises defects. We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.[6] Anything more than a scintilla of evidence is legally sufficient to support the trial court's finding, but as we have frequently said,

2. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

3. *Id.*

4. *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex.1992).

5. *Boys Clubs,* 907 S.W.2d at 477.

6. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1996) (citing *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960))).

" 'some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.' "[7] We have also said that an inference stacked only on other inferences is not legally sufficient evidence.[8]

In reviewing the evidence in the light most favorable to the findings in favor of Pitzner, it is undisputed that the premises did not comply with Dallas City building and mechanical codes in certain respects. Pitzner points to two of these violations as the cause of his fall. First, air conditioning units were required to have a thirty-inch work space in front of their access panels. The access panels of the two units on Marathon's premises faced one another and were ten to twelve inches apart, so that the space was eighteen to twenty inches shy of the code requirements. The spacing from electrical components inside the access panel was also less than the thirty-six inches required by the Dallas Electrical Code.

■ Second, the air conditioning units did not have a power disconnect on the roof so that all electrical power to the units could be shut off by someone working on the roof. The power disconnect to the units themselves was located downstairs, inside the building, and the main power to the building was located on the ground outside of the building. One of the experts at trial theorized that the lack of a power disconnect and the lack of thirty inches of space between the units caused Pitzner to come into contact with a high-voltage line.

The central question in this appeal is whether there is any evidence that Pitzner came into contact with a high-voltage rather than a low-voltage electrical wire or any electrical wire at all.

There was unchallenged testimony from Hull, who completed the repairs after Pitzner's fall, that Pitzner had almost finished repairing a freon leak. All experts agreed that, typically, a repairman would start an air conditioning unit after repairing a freon leak to fully recharge the unit. Pitzner's expert witness said that it was common for repairmen to start an air conditioning unit by connecting two low-voltage lines and that it was also common for repairmen to carry around a screwdriver with a burnt tip so that a new screwdriver would not be ruined each time one was used to short a circuit. He also testified that connecting and shorting two low-voltage lines would not work at premises like Marathon's if the air conditioning unit had been turned off downstairs. In that event, the expert said that a repairman would reach inside the access panel to push the contactor (a black bar), which would bypass the control circuit and start the unit. Although it was common for repairmen to do this, the expert said, it could result in an electrical shock or flash. However, there was no evidence of whether the power to the units had been turned off inside the building while Pitzner was working on them.

Another expert for Pitzner testified that in his opinion, the lack of space between

7. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210 (Tex.2002) (quoting *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n. 3 (Tex.1993) (citing *Kindred v. Con/ Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.")))).

8. *See generally Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex.2001); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex.1997); *Cont'l Coffee Prods., Inc. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984).

the units caused Pitzner to reach into the access panel at an angle that made it more likely that he would come into contact with a high-voltage wire, and that after Pitzner was shocked, he reeled backwards, tripped over a gas pipeline that was on the roof, and fell backwards off the roof. The units were ten feet from the edge of the roof. A gas pipeline ran the length of the roof. It was about two inches in diameter and about five inches above the surface of the roof, and it was about six or seven feet from the units and three or four feet from the edge of the roof.

■ Expert opinions must be supported by facts in evidence, not conjecture.[9] The experts' opinions that Pitzner sustained an electrical shock and fell off the roof because of premises defects pile speculation on speculation and inference on inference. To reach their conclusions, Pitzner's experts postulate that:

1) the power to the air conditioning units had been shut off inside the building so that it was not possible to start the recharged unit by connecting low-voltage wires,

2) therefore, Pitzner must have attempted to reach into the access panel to push the contactor,

3) and therefore, he must have come into contact with a high-voltage wire,

4) which then shocked him, causing him to step back and stumble over a gas pipeline,

5) which then caused him to fall off of the roof,

6) all of which would not have happened if there had been an electrical disconnect on the unit or ten to twelve more

inches of space between the two air conditioning units.

But because there is no proof that the units had been shut off inside the building, it is only speculation that Pitzner reached into the access panel, came into contact with a high-voltage wire, was shocked, stumbled back, and fell off of the building.

■ On this record, the circumstances "could give rise to any number of inferences, none more probable than another."[10] The absence of the ladder at the scene indicates that someone else was present on the premises at some point. The injuries to both the front and back of Pitzner's head are consistent with a fall but also with an assault and battery. The screwdriver's burnt tip could have been burned during a previous job and routinely carried by Pitzner to use on low-voltage wires, or the screwdriver might have been burned on Marathon's roof if it came into contact with a high-voltage wire inside the air conditioning unit. The factfinder could only speculate as to (1) whether Pitzner actually fell from the roof, (2) whether he actually came into contact with a high-voltage wire on Marathon's roof, and (3) whether and how the lack of a power disconnect on the roof or the lack of additional space between the air conditioning units was a substantial factor in causing Pitzner's injuries. As this Court has said, "in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence."[11] That "something else" is absent in this case. There is no evidence that the condition of Marathon's premises proximately caused Pitzner's injuries.

Accordingly, without hearing oral argu-

9. See generally Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499–500 (Tex.1995).

10. Hammerly Oaks, 958 S.W.2d at 392.

11. Lozano, 52 S.W.3d at 148.

ment,[12] we reverse the judgment of the court of appeals and render judgment that Pitzner take nothing on his claim against Marathon.