Francisca ESCOTO, et al., Appellants,

v.

The ESTATE OF Robert AMBRIZ, et al., Appellees.

No. 13–02–171–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

June 8, 2006.

Rehearing Overruled Sept. 14, 2006.

Ray R. Marchan, Watts Law Firm, Brownsville, Alex M. Miller, San Antonio, for appellants.

Ramon Rosales, Law Office of Ramon Rosales, Jr., Mission, David G. Oliveira, Roerig, Oliveira & Fisher, Brownsville, Sharon E. Callaway, Michael J. Murray, Crofts & Callaway, San Antonio, James M.

Tompkins, Galloway, Johnson, Tompkins, Burr & Smith, Houston, for appellees.

Before Justices YAÑEZ, CASTILLO, and GARZA.

## OPINION

Opinion by Justice YAÑEZ.

Following the deaths of four motorists involved in an auto accident with a Nabors Drilling employee ("Nabors"), Robert Ambriz, appellants[1] asserted wrongful death actions against Nabors. A Willacy County jury returned a verdict in favor of appellants. However, the trial court granted Nabor's motion for judgment notwithstanding the verdict ("JNOV"). Appellants appeal the JNOV. We reverse and remand.

### Background

On March 17, 1998, Mr. Ambriz was driving home on Highway 490 after completing a twelve-hour graveyard shift at a Nabors' oil and gas drilling site. As Ambriz drove home, Ambriz's vehicle improperly crossed the highway median and collided head-on with a vehicle driven by Martin Rodriguez and occupied by Leovarda Torres, Roberto Escoto, and Jose Gutierrez. The collision resulted in the deaths of all motorists. Appellants filed suit against Nabors and the estate of Mr. Ambriz,[2] asserting numerous causes of action for negligence, gross negligence, negligence per se, and wrongful death. After a trial on the merits, the jury returned a verdict in appellants' favor. Nabors filed a

1. Francisca Escoto, individually and as the surviving spouse and representative of the estates of Jose Gutierrez and Roberto Escoto, Dora Rodriguez, individually and as the surviving spouse and representative of the estate of Martin Rodriguez and as next of friend of minors, Uvaldo Rodriguez, Isabel Rodriguez, Patricia Rodriguez and Elizabeth Rodriguez, and Noelia Torres, individually and as representative of the estate of Leovarda Torres and as next of friend of minor, Yazmin Torres.

2. All claims against the estate were settled prior to trial.

JNOV, which the trial court granted on February 19, 2002.

### Issues on Appeal

In three issues, appellants contend JNOV was improper because (1) Nabors owed a legal duty to appellants, (2) evidence presented at trial was legally and factually sufficient to support Rodriguezes' capacity to assert wrongful death claims, and (3) the evidence was legally and factually sufficient to support the damages awarded for the conscious pain and suffering of Leovarda Torres.

By two cross-points, Nabors argues that if this Court reverses the trial court's JNOV, it is entitled to a new trial because (1) the evidence is factually insufficient to support the findings on six jury questions, and (2) the court committed charge error.

### Standard of Review

■ A motion for JNOV should be granted when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery.[3] A trial court may disregard a jury's verdict and render judgment notwithstanding the verdict if no evidence supports the jury's findings or if a directed verdict would have been proper.[4] To determine whether the trial court erred in rendering a JNOV, we consider only the evidence, and reasonable inferences from that evidence that tend to support the jury's answers.[5] In other words, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern "no evidence," *i.e.,* legal-sufficiency review.[6] In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.[7]

■ A no evidence challenge is proper when the rules of law or evidence preclude according weight to the only evidence offered to prove a vital fact.[8] If the controlling law permits the vital fact, and more than a scintilla of competent evidence supports the jury's findings, this Court will reverse the JNOV.[9] More than a scintilla arises when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.[10] Evidence that gives rise only to mere surmise or suspicion of the existence of a vital, material factual element is not more than a scintilla and, therefore, no evidence of the vital, material factual element to be inferred.[11]

**3.** *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990).

**4.** *See Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003); *Brown v. Bank of Galveston,* 963 S.W.2d 511, 513 (Tex.1998); *Williams v. Briscoe,* 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

**5.** *See Tiller,* 121 S.W.3d at 713; *Williams,* 137 S.W.3d at 124.

**6.** *See Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003); *Williams,* 137 S.W.3d at 124.

**7.** *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005).

**8.** *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

**9.** *See Miller,* 102 S.W.3d at 709; *Williams,* 137 S.W.3d at 124.

**10.** *See Williams,* 137 S.W.3d at 124 (citing *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995)).

**11.** *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004).

An assertion that the evidence is insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.[12] We consider all of the evidence in the case in making this determination.[13]

### Applicable Law

A cause of action for negligence requires three elements.[14] There must be (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by the breach.[15]

In their first issue, appellants contend Nabors owed them a legal duty because it (1) caused its employee, Ambriz, to become incapacitated, creating a foreseeable risk of harm, and (2) had a duty to adequately train Ambriz regarding the dangers of fatigue. Appellants further argue that Nabors breached its duty in failing to act as a reasonably prudent employer in the same or similar circumstances.

Duty is a threshold inquiry in a negligence action.[16] The existence of a legal duty is a question of law for the court to decide from the particular facts surrounding the occurrence in question.[17] We review the trial court's determination of duty on a de novo basis.[18]

The question of legal duty is a multifaceted issue requiring us to balance a number of factors, such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case.[19] Although the formulation and emphasis varies with the facts of each case, three categories of factors have emerged (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy considerations.[20]

Generally, a person does not have a duty to control the conduct of an another.[21] However, in *Otis Eng'g Corp. v. Clark*,[22] the Texas Supreme Court considered, *inter alia*, whether an employer had a duty to prevent off-duty employees from causing an unreasonable risk of harm to others.[23] In *Otis*, the plaintiffs asserted wrongful death claims against Otis after their wives were killed in an automobile accident caused by Otis's off-duty employee, Robert Matheson, who had left the Otis

---

**12.** *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

**13.** *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998).

**14.** *See D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex.2002).

**15.** *See id.* (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987)).

**16.** *See Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex.1999); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

**17.** *See Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex.1998); *City of McAllen v. De La Garza*, 898 S.W.2d 809, 810 (Tex.1995).

**18.** *See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex.1999).

**19.** *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983); *see also* 1 J. Hadley Edgar, Jr. & James B. Sales, Texas Torts and Remedies 1.03[2][b] (2000).

**20.** *See Graff v. Beard*, 858 S.W.2d 918, 919 (Tex.1993); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990).

**21.** *See Graff*, 858 S.W.2d at 920.

**22.** *Otis Eng'g Corp.*, 668 S.W.2d at 308–19.

**23.** *See id.* at 308.

job site in an intoxicated state.[24] In deciding the duty issue, the court focused on two factors: (1) the employer's knowledge concerning the employee's incapacity, and (2) the extent of control exerted by the employer over its employee.[25]

Regarding employer knowledge, the supreme court noted that several Otis employees informed their supervisor that "Matheson was not acting right."[26] The supervisor also acknowledged he was made aware of Matheson's condition, and that he personally observed his condition.[27] The court concluded that Matheson's "extreme state of intoxication was well known to his supervisor and fellow workers," and that Matheson's supervisor "knew [he] was in no condition to drive home safely that night."[28]

With respect to control, Otis contended on appeal that, at worst, its conduct amounted to nonfeasance.[29] However, the supreme court noted that despite Matheson's intoxication, his supervisor "suggested [to Matheson] that he ... go home," escorted Matheson to the company's parking lot, and allowed him to drive home. In light of these circumstances, the court concluded Otis's conduct rose to such a level that it exercised affirmative acts of control over its employee.[30] The court held that "when, because of an employee's incapacity, an employer exercises control over the employee, the employer has a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others."[31] Nevertheless, the court noted that "the duty of the employer or one who can exercise charge over a dangerous person is not an absolute duty to insure safety, but requires only reasonable care."[32]

■ Since *Otis*,[33] Texas courts have shown an unwillingness to expand the duty to include situations where the employer either had no knowledge of the employee's condition or did not affirmatively exercise control over the employee.[34] Nevertheless, a duty may exist because of an employer's *negligent exercise of control over its employee.*[35]

In *Duge v. Union Pacific R.R. Company*, a long-time railroad employee, Marcelino Garcia, worked a "regular work day" and then worked all night at a train derailment.[36] After being on the job for a total

24. *Id.*

25. *Id.* at 309–11.

26. *Id.* at 308.

27. *Id.*

28. *Id.*

29. *Id.* at 309.

30. *Id.* at 309–10.

31. *See id.* at 311 (citing Restatement (Second) of Torts § 319 (1965)).

32. *Id.*

33. *See Otis Eng'g Corp.*, 668 S.W.2d 307.

34. *See Greater Houston Transp. Co.*, 801 S.W.2d at 526–27; *Estate of Catlin v. Gen. Motors Corp.*, 936 S.W.2d 447, 451 (Tex.App.-Houston [14th Dist.] 1996, no writ); *DeLuna v. Guynes Printing Co. of Texas, Inc.*, 884 S.W.2d 206, 210 (Tex.App.-El Paso 1994, writ denied) (finding that in order for a duty to arise, the employer must not only have some knowledge of the employee's condition or incapacity, but must exercise some control or perform some affirmative act of control over the employee).

35. *See Greater Houst. Transp.*, 801 S.W.2d at 526 (emphasis added).

36. *See Duge v. Union Pac. R.R. Co.*, 71 S.W.3d 358, 360 (Tex.App.-Corpus Christi 2001, pet. denied).

of twenty-seven hours, Garcia concluded his work at the derailment site, and was dropped off by his supervisor at Union Pacific's parking lot where his truck was parked.[37] As Garcia traveled home, a witness observed his truck strike the rear of Edward Duge's truck, causing Mr. Duge's death.[38] As a result, Mr. Duge's wife and son brought a negligence suit against Union Pacific, claiming it was liable for the death because it knew of Garcia's incapacity due to fatigue, but nonetheless placed him on the highway to the foreseeable peril of other travelers.[39] Union Pacific filed a motion for summary judgment, arguing that no genuine issue of material fact existed concerning whether Union Pacific "affirmatively exercised control over Garcia."[40] After considering the motion, the trial court granted summary judgment in Union Pacific's favor.[41] On appeal, at issue was whether Union Pacific owed a duty to the Duges.[42] Summary judgment evidence showed that Garcia did not appear incapacitated prior to leaving Union Pacific's premises, and that during Garcia's fifty-mile commute home, he stopped for fuel, where he visited with a friend for an hour to an hour and a half.[43] Based on the facts, this Court concluded that the trial court's grant of summary judgment was proper and declined to impose a duty on Union Pacific because no genuine issues of material fact existed to support that Union Pacific had knowledge or exercised control over its employee.[44]

In this case, however, the facts are distinguishable from *Duge.* Unlike *Duge,* the record in this case is replete with evidence that Nabors (1) had knowledge concerning the unreasonable risk of harm caused by fatigue, (2) negligently exercised control over its employee, Robert Ambriz, and (3) failed to adequately train Ambriz.

Regarding knowledge, Michael Stephens, Nabors' Health, Safety, and Environmental Manager for the United States, testified that he was aware of the potential dangers of jobs in drilling operations. Stephens nonetheless acknowledged that Nabors did not have a training program that specifically addressed the potential dangers caused by fatigue. With respect to the shift preceding the fatal accident, evidence conflicted regarding the extent of fatigue of Ambriz and his fellow crew workers. However, the last person who observed Ambriz leave the job site was his co-worker, Larry Denning, who was the motorman on the drilling rig. According to Denning, the crew was in a rush to complete a repair to the rig. Denning claimed that as a result, the work on that shift was particularly exhausting. When questioned regarding his personal observations as to whether Ambriz appeared fatigued, he stated that on the shift in question, "we were all tired."

With respect to control, Stephens testified that Nabors required its employees to work twelve-hour graveyard shifts[45] for one week straight, followed by a week of twelve-hour day shifts, taking a week off in between. He acknowledged that other petrochemical companies utilized eight-hour

---

37. *Id.*

38. *Id.*

39. *Id.*

40. *Id.*

41. *Id.*

42. *Id.* at 361.

43. *Id.* at 360.

44. *Id.* at 362–63.

45. The record reflects that the graveyard shift is from 6:00 p.m. to 6:00 a.m., and the day shift is from 6:00 a.m. to 6:00 p.m.

shifts. Stephens also testified that Nabors did not enforce a mandatory break policy, setting the frequency as to when breaks should occur. Stephens stated that if "somebody needs a break, they take a break." Stephens confirmed that Nabors had a written "Fit For Duty" safety policy. According to the policy, prior to every shift, tool pushers and drillers were required to "physically observe each individual ... scheduled for duty ... to assess that each individual is fit for work—that is, not sleepy, hung over, sick." Stephens further testified that under the policy, a designated safety captain, tool pusher, or driller was responsible for executing the fit-for-duty policy. Stephens also stated that Nabors had a program that "trained employees to recognize unsafe conditions within their workplace and to take personal action to help eliminate the unsafe ... condition."

██ On the shift preceding the accident, despite company policy requiring the designation of a safety captain, it was unclear who, if anyone, was assigned to this role. Bertaldo Diaz, the toolpusher who worked the night shift with Ambriz, testified that under Nabors's safety policy, any worker had the right to prevent an employee from working if the employee was unfit for duty. Nevertheless, Diaz testified that fatigue management was not discussed during the night shift in question and he did not know who was designated as the safety captain. Celestino Balderas, a derrickman who also worked that night, testified that it was the responsibility of the driller or tool pusher to supervise workers. However, on the night shift in question, Balderas stated that he did not

"have the time" to tell Ambriz to be careful on the way home. He further testified that Nabors never held any meetings concerning the dangers of fatigue. After a careful review of the record, under these particular circumstances, we conclude that Nabors had a duty because it was aware of the dangers of fatigue, knew of Ambriz's fatigue prior to the accident in question, but nonetheless permitted him to drive home to the foreseeable peril of himself and others.[46] We further conclude that evidence supports that Nabors breached its duty by failing to act as a reasonably prudent employer in same or similar circumstances.[47]

Appellants next contend the evidence is sufficient to support causation. In contrast, Nabors argues that in the event this Court imposes a duty, and subsequently reaches the merits as to causation, the trial court abused its discretion in refusing to exclude appellants' expert's opinion that Ambriz's fatigued condition caused the accident. Nabors argues Dr. Schiflett's testimony concerning causation should have been struck because (1) it was based only on subjective observation, (2) was not subjected to peer review, and (3) was unsupported by underlying data. Nabors also argues that there was no evidence of causation. We first address the admissibility of the testimony of appellants' expert, Dr. Samuel Schiflett.

██ For an expert's opinion testimony to be admissible, the expert must be qualified, the expert's opinion must be relevant to the issues in the case, and the expert's opinion must be based upon a reliable foundation.[48] The trial court has broad

**46.** *See Otis Eng'g Corp.*, 668 S.W.2d at 309–310; *D. Houston, Inc.*, 92 S.W.3d at 456.

**47.** *See Otis Eng'g Corp.*, 668 S.W.2d at 309–310; *D. Houston, Inc.*, 92 S.W.3d at 456.

**48.** *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628–29 (Tex.2002) (citing TEX.R. EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex.1998); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995)).

discretion in this area.[49] It is settled in Texas that a trial court's ruling on the admissibility of evidence will not amount to reversible error unless the error probably led to the rendition of an improper judgment.[50]

■ Dr. Schiflett holds masters and doctorate degrees in experimental psychology, as well as two minors in physiology and human factors engineering. He testified that he worked for the Navy for nine years, and that he was employed with the United States Air Force for fifteen years in operations that focused on the effects of fatigue. Dr. Schiflett served on various panels in the Air Force, conducted research, and facilitated group studies, all focusing on the effects of fatigue in people. In one experiment developed by Dr. Schiflett, and tested and relied on by the National Aeronautics Space Agency on the Columbia Space Shuttle Project, the study focused on the effect of shift-worker[51] fatigue on an individual's circadian rhythm.[52] Dr. Schiflett also testified that his theory concerning shift-worker fatigue and causation was based on research collected over the past sixty years, in particular review articles, such as reports issued by the National Highway Traffic Safety Administration. Dr. Schiflett testified that "microsleeps," which he described as temporary periods of sleep, commonly occur in fatigued individuals without their knowledge. Based on his qualifications, research, group studies, and analysis of the facts of this case, Dr. Schiflett opined that Ambriz's fatigue caused the accident in question. Dr. Schiflett's testimony concerning his qualifications, group studies, and research exceed the level of speculation and subjective observation.[53] Accordingly, we conclude the trial court did not abuse its discretion in admitting Dr. Schiflett's testimony.[54]

We now address the sufficiency of the evidence regarding causation.

■ To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."[55]

■ To evaluate the factual sufficiency of the evidence to support a finding, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak that the finding is clearly wrong and unjust.[56] This Court, however, is not a fact finder; we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of

**49.** *Exxon Pipeline Co.,* 88 S.W.3d at 629.

**50.** Tex.R.App. P. 41.1(a); *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992).

**51.** The study was conducted on individuals who worked twelve-hour shifts.

**52.** Generally, circadian rhythm refers to a person's sleeping pattern.

**53.** *Exxon Pipeline Co.,* 88 S.W.3d at 628–29 (citing Tex.R. Evid. 702; *Gammill,* 972 S.W.2d at 720; *E.I. du Pont de Nemours & Co.,* 923 S.W.2d at 556).

**54.** *Exxon Pipeline Co.,* 88 S.W.3d at 628–29 (citing Tex R. Evid. 702; *Gammill,* 972 S.W.2d at 720; *E.I. du Pont de Nemours & Co.,* 923 S.W.2d at 556).

**55.** *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); *see also St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.).

**56.** *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985).

the evidence.[57]

 Proximate cause requires both cause-in-fact and foreseeability.[58] The test for cause-in-fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred.[59] Foreseeability exists when "the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others."[60] The foreseeability element only requires that the general danger be foreseeable, not the precise sequence of events that produced the harm.[61] Proximate cause may be proven by either direct or circumstantial evidence, but it cannot be based upon conjecture, guess, or speculation.[62]

Testifying experts disagreed regarding whether Ambriz was fatigued, and concerning whether fatigue caused the accident in question. Nevertheless, evidence showed that other companies utilized an eight-hour shift schedule. However, Nabors required its employees to work twelve-hour shifts as a condition of employment. Nabors also required its oil drilling rigs to operate around the clock, with limited downtime allowed only for repair work. Several Nabors employees testified that fatigue was common in the oil industry because of the intense physical nature of their jobs. Nabors's safety manager, Stephens, testified that Nabors had no formal policy establishing the time that employees should take breaks, nor did it have a training policy regarding the dangers attributable to fatigue. It was undisputed that Ambriz had no prior oil field experience, and that he had been employed for less than a year.

Officer Andres Maldonado, a Texas Department of Public Safety ("DPS") officer in charge of the investigation, testified that he had nearly fourteen years of experience, and that he was the instructor at the DPS Academy on accident reconstruction. Prior to the accident, uncontradicted eyewitness reports established that Ambriz's vehicle was weaving. However, the DPS investigation revealed that neither alcohol or external distractions were a factor in the accident, and that Ambriz caused the accident in question. Officer Maldonado stated that he "stopped several vehicles in the past who [he had] thought to be drunk drivers, [but] were not, they were just tired, weaving on the roadway." He further testified that the skid length of Ambriz's vehicle was very short, indicating that Ambriz had taken brief, evasive action immediately prior to the collision. Finally, he testified that based on his investigation, fatigue was a factor in the accident.

 After reviewing this record, we hold that the evidence is legally and factually sufficient to support causation.[63] Evidence supports that Nabors' negligence was the cause-in-fact of the deaths in that its negligent conduct was a substantial factor in causing the accident.[64] We recog-

**57.** *See Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

**58.** *See id.* (citing *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 755 (Tex.1975)).

**59.** *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003).

**60.** *See id.* (citing *El Chico Corp.,* 732 S.W.2d at 313).

**61.** *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex.2001).

**62.** *Marathon Corp.,* 106 S.W.3d at 727.

**63.** *Moriel,* 879 S.W.2d at 25; *Cain,* 709 S.W.2d at 176.

**64.** *Marathon Corp.,* 106 S.W.3d at 727; *Moriel,* 879 S.W.2d at 25; *Cain,* 709 S.W.2d at 176.

nize that cause-in-fact is not shown if a defendant's negligence merely provided a condition that made the accident possible.[65] However, under these factual circumstances, we conclude Nabors provided much more than a condition, as its conduct was instrumental in causing the fatigue, and the subsequent accident in question.[66] As such, it could have anticipated the danger created by its negligent conduct.[67] We therefore conclude a rational juror could have found that Nabors's conduct proximately caused the accident and the four deaths in question.[68] We further conclude that proof of causation is not so weak and the evidence to the contrary is not so overwhelming that the jury's verdict should be set aside and a new trial ordered.[69] Appellants first issue is sustained.

In their second issue, appellants contend the evidence is legally and factually insufficient to support that Martin's wife, Dora, and his four children had the proper authority to assert wrongful death claims. At trial, however, appellees argued that Martin and Dora's marital status was unclear.

■ In this case, the jury viewed several photos of the Rodriguez family, including photos of Martin and Dora at their marriage ceremony. Several witnesses, including Francisca Escoto, also confirmed that the couple was married and had four children. It should also be noted that the evidence to the contrary is negligible. After reviewing the record, we conclude the evidence is legally and factually sufficient to support that Martin and Dora were married with four children.[70] As such, they had the proper authority to assert the wrongful death claims at issue.[71]

In a third issue, appellants contend the evidence is legally and factually sufficient to support the jury's award of $5000 for the conscious pain and suffering of Leovarda Torres prior to her death.

■ As a general rule, the jury has the broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for its calculation.[72] The jury must engage in an honest endeavor to ascertain damages sustained in light of the attendant facts and conditions.[73]

■ It is within the province of the jury's discretion to determine the dollar amount of a plaintiff's pain and suffering.[74] Because there are no objective guidelines to assess the monetary equivalent of pain and suffering resulting from physical inju-

65. See *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

66. *Marathon Corp.,* 106 S.W.3d at 727; *Moriel,* 879 S.W.2d at 25; *Cain,* 709 S.W.2d at 176.

67. *Marathon Corp.,* 106 S.W.3d at 727; *Lee Lewis Constr., Inc.,* 70 S.W.3d at 785.

68. *Clancy,* 705 S.W.2d at 826.

69. See *Cain,* 709 S.W.2d at 176; *Dyson,* 692 S.W.2d at 457.

70. See *Moriel,* 879 S.W.2d at 25; *St. Joseph Hosp.,* 94 S.W.3d at 519; *Cain,* 709 S.W.2d at 176.

71. See *Moriel,* 879 S.W.2d at 25; *St. Joseph Hosp.,* 94 S.W.3d at 519; *Cain,* 709 S.W.2d at 176.

72. See *Mayberry v. Texas Dep't of Agric.,* 948 S.W.2d 312, 317 (Tex.App.-Austin 1997, writ denied).

73. See *Gen. Motors Corp. v. Grizzle,* 642 S.W.2d 837, 845 (Tex.App.-Waco 1982, writ dism'd).

74. *Lege v. Jones,* 919 S.W.2d 870, 877 (Tex. App.-Houston [14th Dist.] 1996, no writ).

ry, the trier of fact is given considerable discretion in awarding amounts appropriate for such damages.[75] The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss.[76] Even where there is no direct evidence of pain, the factfinder may infer pain from the nature of the injury.[77] Pain and suffering may be inferred or presumed as a consequence of severe injuries.[78]

Officer Andres Maldonado testified that he arrived at the scene shortly after the accident. According to Officer Maldonado, the investigation revealed that Ambriz's vehicle had veered into "the wrong side of the roadway" while traveling at approximately sixty-eight miles per hour. Officer Maldonado confirmed through eyewitness interviews that Leovarda was gasping for air shortly after the collision. The record shows that the head-on collision resulted in the deaths of all five individuals in both vehicles. The accident also resulted in multiple fractures in Leovarda's right arm and both legs, severely crushed her chest, and nearly severed her left index finger. Under these circumstances, we conclude the evidence taken as a whole is both legally and factually sufficient to support the jury's award of $5000.[79]

### Nabors's Cross-points

In its first cross-point, Nabors contends that in the event the trial court's JNOV is reversed, it is entitled to a new trial because the evidence is factually insufficient to support the jury's answer to six questions—Questions 1, 2, 7(a), 8(a), 9(a), and 13(a). However, Nabors has failed to cite to either appropriate legal authority and to appropriate portions of the record to support its factual sufficiency challenge.[80] Nabors has therefore waived this issue on appeal. We overrule Nabors's first cross-point.

In Nabors's second cross-point, it contends that in the event the court's JNOV is reversed, it is entitled to a new trial because the court submitted improper questions and instructions in questions one and two of the jury charge. Nabors argues specifically that the court (a) should have submitted a separate question on control, (b) improperly instructed the jury on the appropriate standards of care for negligence, and (c) should have submitted appellants' two negligence theories in a single, broad-form question format.

### Standard of Review–Charge Error

Our review of the trial court's submission is under an abuse of discretion standard.[81] The trial court has broad discretion in submitting jury questions as long as the submission fairly places the

**75.** See *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex.1997); *Southwest Texas Coors, Inc. v. Morales*, 948 S.W.2d 948, 951 (Tex.App.-San Antonio 1997, no pet.).

**76.** See *Tagle v. Galvan*, 155 S.W.3d 510, 518 (Tex.App.-San Antonio 2004, no pet.).

**77.** See *Prescott v. Kroger Co.*, 877 S.W.2d 373, 376 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

**78.** *City of Austin v. Selter*, 415 S.W.2d 489, 501 (Tex.Civ.App.-Austin 1967, writ ref'd n.r.e.).

**79.** See *Moriel*, 879 S.W.2d at 25; *Cain*, 709 S.W.2d at 176; *Prescott*, 877 S.W.2d at 376; *City of Austin*, 415 S.W.2d at 501.

**80.** See Tex R.App. P. 38.1(h).

**81.** *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 54 (Tex.App.-Dallas 1995, writ denied).

disputed issues before the jury.[82] A trial court is afforded more discretion when submitting instructions than when submitting questions.[83] To determine if the failure to submit a requested instruction is error, we must consider the pleadings, trial evidence, and the entire charge.[84] An error will be deemed reversible only if, when viewed in the light of the totality of the circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated to and probably did cause the rendition of an improper judgment.[85]

### *Applicable Law*

▅▅▅▅ Rule 277 of the Texas Rules of Civil Procedure requires the use of broad-form questions be used whenever feasible.[86] However, broad-form submission does not entail omitting elements of proof from the charge.[87] The trial court must submit instructions as shall be proper to enable the jury to render a verdict.[88] Nevertheless, a trial court can generally inquire about separate issues of negligence in a single question with proper instructions.[89] Additionally, controlling issues may be submitted by questions, instructions, definitions, or a combination thereof.[90]

Generally, a cause of action for negligence in Texas requires three elements.[91] There must be a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach.[92] Proximate cause requires both cause-in-fact and foreseeability.[93] Foreseeability exists when "the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others." [94]

▅▅▅▅ An employer has a duty to adequately hire, train, and supervise employees.[95] A cause of action for negligent supervision is based on an employer's direct negligence.[96] Under the tort of negligent supervision, a negligent employer may be directly liable to a third party whose injury was proximately caused by the employee's negligent or intentional act.[97]

**82.** *Varme v. Gordon*, 881 S.W.2d 877, 881 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

**83.** *Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex.App.-San Antonio 1998, pet. denied).

**84.** *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986) (op. on reh'g).

**85.** *See id.*

**86.** *See* Tex.R. Civ. P. 277.

**87.** *Diamond Offshore Mgmt. Co. v. Guidry*, 171 S.W.3d 840, 844 (Tex.2005).

**88.** *See* Tex.R. Civ. P. 277.

**89.** *See id.*

**90.** Tex.R. Civ. P. 278; *Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 422 (Tex.App.-Corpus Christi 1990, writ denied).

**91.** *See D. Houston, Inc.*, 92 S.W.3d at 453.

**92.** *See id.* (citing *El Chico Corp.*, 732 S.W.2d at 311).

**93.** *See id.* (citing *Farley*, 529 S.W.2d at 755).

**94.** *See id.* (citing *El Chico Corp.*, 732 S.W.2d at 313).

**95.** *Garcia v. Allen*, 28 S.W.3d 587, 592 (Tex. App.-Corpus Christi 2000, pet. denied).

**96.** *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942, 950 (Tex.App.-Amarillo 1994), *aff'd*, 907 S.W.2d 472 (Tex.1995).

**97.** *See Golden Spread Council, Inc. No. 562 of Boy Scouts of America v. Akins*, 926 S.W.2d 287, 294 (Tex.1996).

## The Charge

In this case, appellants' claims of negligence were based on two different theories—a general negligence theory and a more specific theory of a negligent failure to train and supervise. The court submitted the following definitions to the jury:

"**Negligence**,"[98] when used with respect to the conduct of Nabors Drilling USA, Inc., means failure to use ordinary care, that is, failing to do that which a company of ordinary prudence would have done under the same or similar circumstances or doing that which a company of ordinary prudence would not have done under the same or similar circumstances.

"**Ordinary Care**,"[99] when used with respect to the conduct of Nabors ... means that degree of care that an employer of ordinary prudence would use under the same or similar circumstances.

In question one, the court submitted a single question with instructions as follows:

### QUESTION NO. 1:

Did the negligence, if any, of those named below, proximately cause the occurrence in question?

You are instructed that in order to find Nabors Drilling negligent, you must find:

1) Roberto Ambriz was incapacitated,
2) Nabors Drilling exercised control over Roberto Ambriz, and
3) Nabors Drilling failed to act as a reasonable and prudent employer under the same or similar circumstances would in order to prevent an employee from causing an unreasonable risk of harm to third persons.

The jury answered "Yes," finding Nabors and Ambriz liable for negligence, but answered "No," declining to impose liability on Martin Rodriguez.

In question two, the jury was asked the following:

### Question No. 2

Was the negligence, if any, of Nabors Drilling in failing to adequately train Roberto Ambriz a proximate cause of the occurrence in question?

The jury answered "Yes," holding Nabors liable for negligence in failing to train Ambriz.

### Analysis

■ We disagree with Nabors's argument that a separate question on control was required. Although omission of the entire element of control from the jury charge would have been error, question one included a predicate instruction that a finding of control was necessary in order to impose negligence liability, and a request for the jury to determine whether Nabors was negligent. Because the question included a proper predicate instruction regarding control and asked the jury to make a finding regarding control, we conclude the court did not abuse its discretion in submitting the negligence issue in a single question format.[100]

■ Nabors further argues that the court should have issued a predicate instruction in question one and two that in order for the jury to hold Nabors liable, it

98. Emphasis in original.

99. Emphasis in original.

100. *See* Tex.R. Civ. P. 277; *Diamond Offshore Mgmt. Co.,* 171 S.W.3d at 844; *Varme,* 881 S.W.2d at 881.

had to find that Nabors "had knowledge of [its] employee's incapacity." However, the court instructed the jury that in order to find Nabors liable, it was required to find that (1) Ambriz was incapacitated, (2) Nabors exercised control over Ambriz, and (3) Nabors failed to act as a reasonable and prudent employer under the same or similar circumstances. Additionally, knowledge was inherent in the charge to the jury, which included a requirement of a predicate finding that Nabors exercised control over Ambriz. In light of the pleadings, evidence, and charge, and for the reasons discussed above, we conclude it was not reasonably necessary to include a specific instruction regarding knowledge.[101] Accordingly, there was no abuse of discretion, and even if there were an abuse of discretion, we would not be able to conclude that it probably led to the rendition of an improper judgment.[102]

█ Finally, Nabors argues that the court should have submitted both negligence theories in a single, broad-form submission. However, submitting alternative liability standards when the governing law is unsettled might very well be a situation where broad-form submission is not feasible.[103] Similarly, when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying rule 277 by avoiding the need for a new trial when the basis for liability cannot be determined.[104]

█ The record reflects that the court was uncertain with respect to the governing law at the time the charge was submitted. Additionally, the parties diverged with respect to their interpretation of the law governing the facts of this case. Consequently, the trial court was within his discretion in submitting each negligence theory separately.[105] Having fully considered Nabors's arguments regarding the court's charge, we overrule its second cross-point.

### Conclusion

After a review of the entire record, we conclude the trial court erred in granting a judgment notwithstanding the verdict in Nabors's favor. Accordingly, we reverse the trial court's order, reinstate the jury's verdict, and remand to the trial court to enter judgment based on the jury's verdict.

Dissenting Opinion by Justice CASTILLO.

CASTILLO, Justice, dissenting.

Escoto appeals from the trial court's order granting a motion for judgment notwithstanding the verdict ("JNOV"). The majority sustains the appeal and remands for entry of judgment based on the jury's verdict. I respectfully dissent.

As the majority notes, "the existence of a legal duty is a question of law for the court to decide, and that determination is made from the facts surrounding the occurrence in question." *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 563 (Tex.2005) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309, (Tex.1983)).

In deciding whether to impose a common-law duty, this Court has applied the familiar factors, ... [including] social,

---

101. Tex.R. Civ. P. 277; *Diamond Offshore Mgmt. Co.*, 171 S.W.3d at 844; *Varme*, 881 S.W.2d at 881.

102. *See* Tex.R.App. P. 44.1(a).

103. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex.2000).

104. *Id.*

105. *See id.*

economic, and political questions and their application to the facts at hand. We have weighed the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. Also among the considerations are whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.

*Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex.2004).

Although the formulation and emphasis varies with the facts of each case, three categories of factors have emerged: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy considerations. *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 34 (Tex.2002) (citing *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990)). Generally, there is no duty to control the conduct of others. *Id.* (citing *Greater Houston Transp. Co.*, 801 S.W.2d at 525). This general rule does not apply when a special relationship exists between an actor and another that imposes upon the actor a duty to control the other's conduct. *Id.*

In *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 457 (Tex.2002), the Texas Supreme Court held that "when an employer exercises some control over its independent contractor's decision to consume alcoholic beverages to the point of intoxication, such that alcohol consumption is required, the employer must take reasonable steps to prevent foreseeable injury to the independent contractor caused by drunk driving." *Id.* That decision was based, in large part, on the conclusion that impairment from

alcohol consumption presents a foreseeable risk of harm to others. *Id.* (citing *Otis Eng'g Corp.*, 668 S.W.2d at 311). Here, however, we are presented with a question of alleged fatigue caused by long hours on the job, and not intoxication impairment.

This question was previously presented to this Court. *See Duge v. Union Pacific Railroad Co.*, 71 S.W.3d 358 (Tex.App.-Corpus Christi 2001, pet. denied). In *Duge*, an employee worked a regular work day, and then also worked all night at a train derailment. After being on the job for twenty-seven hours, he left to drive to his home fifty miles away. *Id.* at 360. During this trip, the employee ran into the back of the Duges' vehicle, killing Mr. Duge. *Id.* Appellants urged that the railroad had the duty to know of the employee's incapacity due to fatigue but nevertheless placed him on the highway, to the foreseeable peril of other travelers. *Id.* This Court noted that *Otis Eng'g Corp.* 668 S.W.2d at 311, requires an employer to (1) have knowledge of the employee's capacity, and then (2) to exercise control over the incapacitated employee. *Id.* at 362 (citing *Otis Eng'g Corp.*, 668 S.W.2d at 309–11; *Jenkins v. Kemlon Prod. & Dev. Corp.*, 923 S.W.2d 224, 226 (Tex.App.-Houston [14th Dist.] 1996, no writ)).

> Even if we assume that fatigue was a factor in the accident, Garcia did not know the extent of his own fatigue. His employer cannot be charged with such knowledge. Appellants cite no Texas case law, and we have found none, imposing liability on an employer for damages caused by a fatigued employee driving home after work. However, there is case law declining to impose such liability in similar circumstances.

*Id.* The record in this case does not reflect that Nabors had affirmative knowledge of excessive fatigue in the employee. Instead, evidence points to length of shifts,

break policies, training policies and other issues that may impact but do not directly establish knowledge by Nabors that this employee was so tired that his driving would cause a foreseeable risk of harm to others. Awareness of the potential dangers of fatigue does not constitute the requisite knowledge that an employee has become incapacitated; nor does it raise a duty to exercise control over that employee after he has left the workplace. I similarly find no case law extending the principles of *Otis Eng'g Corp.,* 668 S.W.2d at 311, to the circumstances of this case. I would conclude this case is not distinguishable from *Duge,* and that no duty was owed by Nabors to appellants. *See id.* I therefore respectfully dissent, and would affirm the trial court's order granting the motion for judgment notwithstanding the verdict.