# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00099-CV

**Appellant, David T. Phillips//Cross-Appellant, Estate of Phillip O. Poulin**

**v.**

**Appellees, Estate of Phillip O. Poulin//Cross-Appellees, David T. Phillips**

### FROM PROBATE COURT NO. 1 OF TRAVIS COUNTY, NO. 73677-b, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

David T. Phillips and the estate of a business partner, Phillip O. Poulin, each appeal from a judgment awarding the Estate $11,300 in damages on its claims against Phillips for breach of fiduciary duty and denying Phillips recovery on his counterclaims against the Estate. For the reasons explained below, we affirm the judgment.

This is one of two related appeals arising from a dispute between Phillips and the Estate. During his lifetime, Poulin had invested in two real estate-related general partnerships with Phillips, and owned 50-percent shares with Phillips in a corporation that managed properties including those owned by the two partnerships. Phillips kept the books for these entities, though it is undisputed that both men had access to the entities' books and bank accounts, and could issue checks. Poulin died in November 1998. Upon his death, it is undisputed that the Estate succeeded to Poulin's interests in the three entities.

As Poulin's heirs attempted to settle his affairs thereafter, they raised questions concerning certain transactions by Phillips involving these entities and encountered what they perceived to be resistance when seeking information from Phillips. The Estate eventually filed suit against Phillips seeking an accounting of their respective interests in the entities. Phillips counterclaimed, alleging in part that Poulin had breached the partnership agreements by improperly paying himself funds and that he and the Estate had failed to make required contributions. The Estate later amended its petition to add claims against Phillips for breach of fiduciary duty, alleging that Phillips had engaged in self-dealing transactions that were unfair to the Estate's interests, and sought a constructive trust on certain assets.

The probate court severed the Estate's accounting claim from the Estate's breach-of-fiduciary duty claims and Phillips's counterclaim. The accounting claim is the subject of our opinion and judgment in Cause No. 03-05-00098-CV, which we also issue today.[1] The present cause concerns the Estate's breach-of-fiduciary duty claims and Phillips's counterclaims.

We will discuss the evidence pertaining to each of these claims as it becomes relevant to our analysis. The claims were tried to the probate court over two several days. Phillips, whose attorney had withdrawn by this juncture, represented himself at trial. Following trial, the probate court rendered judgment that the Estate "should recover $11,300 from [Phillips] by reason of [Phillips's] breach of fiduciary duty, and that all further relief should be denied." The court also ordered that Phillips take nothing on his counterclaims. Both the Estate and Phillips appeal from this

---

[1] *Phillips v. Estate of Phillip O. Poulin*, No. 03-05-00098-CV (Tex. App.—Austin Oct. 12, 2007, no pet. h.).

2

judgment, raising legal and factual sufficiency challenges to the evidence supporting various findings (or failures-to-find facts) implied by the judgment.

**Standard and scope of review**

The probate court's judgment does not elaborate on its basis for awarding "$11,300 from [Phillips] by reason of [Phillips's] breach of fiduciary duty." Nor did the probate court prepare findings of fact and conclusions of law, and neither party requested it to do so. In such instances, we must affirm the judgment on any theory of law applicable to the case that is supported by the evidence. *Anderson Mill Mun. Util. Dist. v. Robbins*, No. 03-04-00369-CV, 2005 Tex. App. LEXIS 7482, at *12 (Tex. App.—Austin Sept. 8, 2005, no pet.); *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 251-52 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). The parties may, however, challenge the evidence supporting implied findings for legal and factual sufficiency. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex. 2002).

When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id*. at 827. There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706,

711 (Tex. 1997). More than a scintilla of evidence exists to support a finding if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id*.

When a party challenges the legal sufficiency of an adverse finding on an issue on which that party had the burden of proof, that party must demonstrate on appeal that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). When reviewing this type of legal sufficiency challenge, we must first examine the record for evidence that supports the finding. If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is conclusively established. *Id*. The point of error will be sustained if the contrary proposition is conclusively established. *Id.*

A party attacking the factual sufficiency of an adverse finding on an issue on which that party did not have the burden of proof at trial must show on appeal that there is insufficient evidence to support the adverse finding. *Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no pet.). In our review of this issue, we examine the entire record and consider and weigh all the evidence, both in support of, and contrary to, the challenged finding. *Id*. We must uphold the finding unless the evidence that supports it is so weak as to be clearly wrong or unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). A party challenging the factual sufficiency of an adverse finding on an issue on which that party had the burden of proof at trial must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. To conduct this review, we must consider and weigh all of the evidence, and we can set aside a verdict only if the

4

evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*.

The parties' issues and claims concern several discrete sets of transactions, and are best grouped for discussion along those lines.

**Y&O, Inc. salary distribution**

The probate court heard evidence that Phillips and Poulin each owned 50% of the shares in Y&O, Inc. Poulin was Y&O's president, and Phillips its vice-president. Y&O held contracts to manage various apartment properties. Income from these management contracts was paid to Poulin and Phillips as officer salaries. The Y&O general ledgers from the year preceding Poulin's November 28, 1998 death reflected the following salary payments:

| Date | Poulin | Phillips |
|------|--------|----------|
| 12/2/97 | $ 1,700 | $ 1,700 |
| 1/5/98 | $ 1,700 | $ 1,700 |
| 1/15/98 | $ 1,758 | $ 1,758 |
| 2/12/98 | $ 1,850 | $ 1,858 |
| 3/16/98 | $ 1,500 | $ 1,500 |
| 4/14/98 | $ 3,750 | $ 3,750 |
| 5/15/98 | $ 1,900 | $ 1,900 |
| 6/15/98 | $ 1,700 | $ 1,700 |
| 6/29/98 | $ 1,000 | $ 1,000 |
| 7/15/98 | $ 2,200 | $ 620 |
| 8/18/98 | None | $ 700 |
| 9/1/98 | $ 11,300 | $ 700 |
| 10/1/98 | $ 2,250 | $ 1,000 |
| 11/1/98 | $ 466 | $ 466 |

During this period, Phillips and Poulin had agreed to split Y&O income 50-50%. While many of the salary payments reflected in the ledger are consistent with this arrangement, some are not. In total, Poulin received $12,730 more in salary during this period than Phillips. The largest single component of the difference is a $11,300 payment to Poulin on September 1.

The parties agree that this ledger entry reflects a check drawn on Y&O that Poulin wrote himself on September 1 in the amount of $11,300. On the check was written the notation "Dividend 9000" and "Sept Mgm 2300." The parties concur that Poulin had intended this check to both pay his monthly officer's salary and split with Phillips $18,000 of the proceeds of a $20,000 credit in late August for "Stock Sale." Around the same time, Phillips wrote himself a $9,000 check drawn on Y&O with the notation, "Stock Sale Proceeds." Unlike Poulin's check, Phillips's check is not reflected in the Y&O ledger as salary, and there was no evidence specifying where or how it might have been reflected in Y&O's books.

The Y&O general ledger reflects the following salary payments in the aftermath of Poulin's death:

| Date | Poulin | Phillips |
|---------|---------|----------|
| 12/1/98 | $ 1,600 | $ 3,300 |
| 12/9/98 | None | $ 2,300 |
| 1/1/99 | None | $ 2,800 |
| 1/1/99 | None | $ 6,000 |

It was undisputed that Phillips caused these salary payments to be made to himself. The amounts of these payments were generally larger than those he had received during the previous year and exceeded the amount Poulin or his Estate received during the same period.

6

The Estate alleged that Phillips had breached his fiduciary duties to the Estate in connection with his salary payments following Poulin's death. At trial, Phillips countered these allegations in part by explaining that these salary payments merely offset salary amounts that Poulin had previously been overpaid relative to their agreed-upon percentage distribution. He emphasized that when all of the salary payments reflected in the Y&O general ledger between December 1997 and January 1, 1999 are totaled (including the $11,300 check to Poulin and Phillips's salary payments following Poulin's death), Poulin received a net $2,030 more than Phillips. Phillips also maintained that (1) he and Poulin had agreed to split Y&O income 60%-to-Phillips, 40%-to-Poulin from 1994 through June 1997,[2] (2) Poulin had consistently received (or paid himself) more than his proportionate share, (3) in an amount totaling $18,792.90 for the period 1994 through January 1, 1999. In one of his counterclaims against the Estate, Phillips sought recovery of these alleged overpayments to Poulin.

At trial, Phillips introduced a spreadsheet purporting to reflect his and Poulin's respective actual salary figures, purportedly derived from Y&O tax returns; the salary each should have received at the alleged agreed-upon percentage distributions; and what he asserts were his annual underpayments, totaling $18,792.90. The totals incorporated in the spreadsheet appear to include both Poulin's $11,300 check and Phillips's salary payments to himself following Poulin's death.[3]

---

[2] Phillips claimed that the additional amount reflected his disproportionate work efforts in connection with certain management contracts for which he, and not Poulin, was responsible.

[3] Specifically, the total salary Poulin received between December 1997 and November 1998—including his $11,300 check on September 1—as reflected in Y&O's general ledger corresponds precisely to the total amounts that Phillips's spreadsheet and related testimony indicated that Poulin received during the same period.

The Estate argued that the evidence supported the inference that Phillips had caused Poulin's $11,300 check to be reflected entirely as salary (while only $2,300 was actually salary, and the rest a dividend) as part of a scheme to inflate the amounts the Y&O books stated that Poulin had received as salary, enabling Phillips to later claim that he was owed offsetting amounts in salary.[4]

In his first issue, Phillips challenges the legal and factual sufficiency of an implied finding that the Estate incurred any damage from "the alleged miscoding" of Poulin's $11,300 check. Specifically, Phillips insists that "[n]o evidence demonstrated that Phillips received more than Poulin in connection with that stock sale . . . [n]or was there any evidence that Poulin received any less money, as salary or otherwise, in connection with the stock sale, despite the apparent mischaracterization of Poulin's $11,300 check on the books." In his second issue,[5] Phillips asserts that the evidence conclusively establishes his entitlement to judgment on his counterclaim for $18,792.90 in alleged underpayments of Y&O salary relative to Poulin and that the probate court's failure to render that award is against the great weight and preponderance of the evidence.

It is undisputed that within approximately five weeks after Poulin's death, Phillips had $14,400 paid to himself, ostensibly for salary, in checks of $6,000, $2,800, $2,300 and $3,300. As a fiduciary, Phillips had the burden of establishing the fairness of these transactions. *Texas Bank*

---

[4] In other words, Phillips's $9,000 share from the stock sale did not "count against" his Y&O salary share, while Poulin's did. The effect, under the Estate's theory, was that Phillips both pocketed his $9,000 share of the stock sale and contrived a claim against Y&O (and Poulin) for $9,000 more in salary to offset the amount the Y&O books showed that Poulin had received.

[5] Phillips presents a total of three issues. His second issue concerns his breach-of-fiduciary-duty claim, and includes three subparts, each of which concerns a different theory of recovery under that claim. For simplicity, we will refer to these subparts as his second, third and fourth issues. Similarly, what he has termed his "third" issue will be identified as the "fifth" issue.

*& Trust Co. v. Moore*, 595 S.W.2d 502, 509 (Tex. 1980); *Estate of Townes v. Townes*, 867 S.W.2d 414, 417 (Tex. App.—Houston [14th Dist.] 1993, writ denied). The evidence is legally and factually sufficient to support the probate court's implied finding that Phillips failed to meet that burden. To establish the fairness of the salary payments he made to himself, Phillips attempted to justify them as his attempts to offset prior overpayments of salary to Poulin. But Phillips acknowledges that the alleged salary "overpayments" to Poulin on which he relies included the $11,300 check that, he acknowledges, was mis-classified by including in Poulin's salary the $9,000 component from stock sale proceeds. These facts, as well as the haste with which Phillips wrote himself "salary" checks following Poulin's death that were substantially larger than those he had generally received previously, undermine Phillips's justification of why the payments were fair. In context, the facts also can support the reasonable inference that Phillips, who kept the businesses' books, deliberately caused Poulin's check to be reflected as salary so as to inflate the corresponding salary amount Phillips could claim for himself. Further, the evidence is legally and factually sufficient to support the probate court's damages award, which is well within the $0 to $14,400 range potentially recoverable under the Estate's theory. *See McMillian v. State Farm Lloyds*, 180 S.W.3d 183, 201-03 (Tex. App.—Austin 2005, pet. denied).[6]

---

[6] Phillips insists that the probate court's judgment represents damages attributable solely to the mis-classification of the $11,300 check. To the contrary, in the absence of findings of facts and conclusions of law, the judgment will stand on any legal theory supported by the evidence. *Anderson Mill Mun. Util. Dist.,* 2005 Tex. App. LEXIS 7482, at *12. In attempting to define the appellate issues more narrowly, Phillips relies on a pre-judgment letter from the probate court advising the parties, in relevant part, that:

> The Court denies Plaintiff's breach of fiduciary duty claims on the sale of the partnership property. The burden is on the fiduciary to prove reasonableness and

This conclusion is further supported by our analysis of Phillips's second issue. Phillips's counterclaim for $18,792.90 in alleged underpayments of Y&O salary relative to Poulin is predicated on his contention that he and Poulin had agreed to a 60-40% split of Y&O income

fairness when a transaction is deemed by the fact-finder to be self-dealing. The Defendant has met his burden regarding the sales price. In regards to the breach of fiduciary duty claim as to the allocation of funds received and charges as draws in the Y&O, Inc. partnership [sic], the Court finds that Defendant breached his fiduciary duty by allocating $11,300 ($9,000 salary and $2,300 expenses) as a salary draw while treating his $9,000 as a dividend. The Court awards $11,300 to Plaintiff for Defendant's breach.

* * *

The Court denies any other claims raised by Plaintiff against Defendant.

The letter concluded by directing the Estate's counsel to prepare and present an order for the court's signature.

Pre-judgment letters of this sort do not constitute findings of fact and conclusions of law and are not competent evidence of a trial court's basis for judgment. *See Cherokee Water Co. v. Gregg Co. Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex. 1990) (observing that the trial court "could have disregarded the evidence at the time judgment was actually signed" and that such a letter "is not a finding of fact" as contemplated by the Texas Rules of Civil Procedure); *Mondragon v. Austin*, 954 S.W.2d 191, 193 (Tex. App.—Austin 1997, pet. denied) (pre-judgment letter "cannot constitute findings of fact and conclusions of law") (citing *Cherokee Water Co.*, 801 S.W.2d at 878 ); *see also Gulf States Util. Co. v. Low*, 79 S.W.3d 561, 565 (Tex. 2002) (post-verdict, pre-judgment letter ruling did not illuminate trial court's intended basis for judgment because "it was interlocutory and its terms were never incorporated into the final judgment"); Tex. R. Civ. P. 296-98 (procedural protections for parties in regard to findings of fact and conclusions of law).

Phillips also emphasizes that the amount of damages awarded to Poulin by the probate court—"$11,300 . . . by reason of [Phillips's] breach of fiduciary duty"—corresponds to the amount of Poulin's September 1, 1998 check. But the mere fact that a fact-finder's damages award corresponds to the amount yielded by a particular theory does not alone imply that the fact-finder relied on that theory when a different theory supported by the evidence would yield a range of damages encompassing the amount awarded. *See McMillian v. State Farm Lloyds*, 180 S.W.3d 183, 201-03 (Tex. App.—Austin 2005, pet. denied).

10

between 1994 and mid-1997. Phillips insists that the evidence conclusively establishes the existence of this agreement. He points to the spreadsheet that he introduced into evidence and the testimony of his bookkeeper, who had prepared the exhibit at his direction. Phillips did not himself testify regarding this alleged agreement. As for the bookkeeper, her testimony was, at best, equivocal. While she initially testified that she understood such an agreement existed, she acknowledged that "I was never—never saw anything in writing," nor was there evidence of any written memorialization of such an agreement. The bookkeeper later admitted that she had never been privy to such an agreement and, when asked whether she knew that Poulin had agreed to the split, conceded that, "I guess I don't." The probate court could reasonably have viewed this evidence as failing to establish that there was an agreement to split Y&O income 60-40%, *see City of Keller*, 168 S.W.3d at 819-21, and its failure to find the existence of such an agreement was not against the great weight and preponderance of the evidence.[7] This further undermines Phillips's justification of the fairness of the salary payments.

We accordingly overrule Phillips's first two issues.

**"Fire job" proceeds**

Phillips, Poulin and others were general partners in Hill Country Partnership, which owned an apartment complex in San Marcos. Poulin owned a 67% share, Phillips owned 22%, and

---

[7] Furthermore, as the Estate observes, the relative income distributions reflected in both the Y&O general ledger and Phillips's own spreadsheet are both irregular and inconsistent with the alleged 60-40% split. These facts are at least as consistent with the inference that no 60-40% split agreement existed as they are with the inference that one existed but was not complied with. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813-14 (Tex. 2005).

11

others owned the remaining 11%. Hill Country had insurance coverage for the apartments through Vesta Fire Insurance Corporation. After a fire damaged the apartments, Poulin undertook to act individually as general contractor in repairing and restoring the property. Phillips, on behalf of the partnership, signed a construction agreement with Poulin, as contractor, stating that the contract price would be the "[f]ull amount of insurance proceeds as approved by Vesta Insurance." At an earlier juncture in this litigation, the Estate filed a third-party action against Vesta to recover approximately $28,000 for the remaining balance of expenses incurred in repairing the fire loss. The Estate eventually settled with Vesta, and Vesta was dismissed from the litigation.

In one of his counterclaims, Phillips alleges that Hill Country, not the Estate, was entitled to any insurance proceeds from the settlement; that the Estate and its attorney improperly diverted a check for $25,000 in insurance proceeds payable to Hill Country rather than giving it to the partnership for distribution; and that Phillips is entitled to a 22% share of the proceeds ($5,500). In its third issue, Phillips insists that the evidence conclusively established that the Estate diverted such a check, or that the probate court's failure to so find is against the great weight and preponderance of the evidence. He points solely to the testimony of Suzie Poulin, Poulin's adult daughter, during Mr. Phillips's pro se cross-examination of her. During their exchange, Ms. Poulin acknowledged that the Estate had received a $25,000 check in the lawsuit settlement, that the Hill Country Partnership was the named insured on the policy, but that she *did not know* whether the check was made payable to the partnership. Especially in light of the construction agreement between Hill Country and Poulin, the evidence does not conclusively establish Phillips's entitlement

12

to a share of the insurance proceeds or that the probate court's implied contrary findings are against the great weight and preponderance of the evidence. We overrule Phillips's third issue.

**The "Santa Monica Bank" entry**

Phillips also counterclaimed seeking recovery of $15,000 that he alleges Poulin wrongfully took or withheld from Y&O by transferring it to a personal bank account he held in Santa Monica, California. In his fourth issue, Phillips asserts that "uncontroverted evidence" conclusively establishes his entitlement to judgment on this counterclaim or that the probate court's implied contrary findings rejecting that theory were against the great weight and preponderance of the evidence. As support, Phillips points to the following evidence:

- The Y&O general ledger contains an entry on August 8, 1998, reflecting a payment to "(Santa) Santa Monica Bank" in the amount of $15,000.

- Suzie Poulin testified that Poulin had a bank account in a Santa Monica bank. Ms. Poulin also testified that Poulin and his family had investment properties in Southern California.

- There was testimony that Poulin (like Phillips) had authority and capacity to endorse a check to himself from the Y&O account.

- Poulin had previously written checks to himself from the Hill Country Partnership account and deposited into his separate fire job account or the accounts for other personal enterprises.

We disagree that this evidence, without more to elaborate on the nature of the transaction and to connect Poulin to it, conclusively establishes the combination of inferences necessary for Phillips to prevail on his counterclaim: i.e., that (1) *Poulin* had made the payment or caused it to be made; (2) the payment went to someone's *account* at "Santa Monica Bank";

13

(3) "Santa Monica Bank" was the *financial institution in that city where Poulin has his account*; (4) the bank account into which the money was paid was the one held by *Poulin*; and (5) that the payment was for *Poulin's personal use or benefit. See, e.g., Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (inferences stacked only upon inferences is no evidence). Furthermore, the probate court's implied contrary findings are not against the great weight and preponderance of the evidence. We overrule Phillips's fourth issue.

**Litigation expenses**

In his fifth issue, Phillips contends that the evidence conclusively establishes his entitlement to judgment on a counterclaim against the Estate seeking contribution for expenses Phillips claims he incurred in defending a lawsuit against the Hill Country Partnership. In late 2000, Hill Country, Y&O, Inc., and Phillips were sued in a personal injury action arising from injuries the plaintiff received during a November 1999 fire at the Hill Country Apartments.[8] By that time, Poulin had died, the Estate had succeeded to his partnership interest, and the Hill Country Apartments had been sold. Hill Country's insurance carrier initially denied coverage on the claim, but later provided a defense and the case was settled. Phillips alleges that, in the interim, he incurred $21,496.61 in legal fees and other costs defending the claim on behalf of the partnership. In his counterclaim, he seeks what he contends is the Estate's 67% partnership share of these expenses, $14,402.72. He maintains that the evidence conclusively entitles him to judgment on that claim or that the probate

---

[8] This fire was subsequent to the one that caused the damage Poulin had repaired as general contractor, and occurred in a different building.

14

court's implied findings to the contrary are against the great weight and preponderance of the evidence. Phillips's evidence of these expenses consists of:

- legal bills from an attorney, ultimately totaling $6,190.78, reflecting that all but $1,199.01 of this amount was paid by Zurich American Insurance Company. Each invoice was addressed to Y&O, Inc. The final invoice was dated May 2002.

- a memorandum, dated December 1, 2001, from Phillips to "Y&O, Inc.," regarding "Invoice for Services Representing Corporation" in the lawsuit, requesting payment of $20,000 (100 hours @ $200 per hour) for his services in "Representation of Corporation in lawsuit; Extensive review of all documents."[9]

- a similar memorandum of the same date from Phillips's bookkeeper requesting payment of $297.60 (10 hours @ $29.76 per hour) for "Assistance provided to corporation and David Phillips in this lawsuit."

We conclude that when considered in light of the record as a whole, Phillips's memorandum, that of his bookkeeper, and her similarly conclusory trial testimony concerning these purported expenses[10] could reasonably have been disregarded as incredible by the probate court. *See City of Keller*, 168 S.W.3d at 820. Additionally, these documents, like the attorney's fee invoices, were each addressed to Y&O, Inc., not the Hill Country Partnership. Phillips never elaborates or identifies evidence explaining why or how the Estate, by virtue of its interest in Hill Country Partnership, would have liability for the legal expenses of the corporation. We overrule Phillips's fifth issue.

---

[9] Phillips sent a similar memo on the same date to Y&O for $1,458.24 for his services in responding to the Estate's discovery in this proceeding.

[10] Phillips inquired of the bookkeeper, "Did you render good and valuable service along with myself in dealing with the plaintiffs' counsel in this matter?" and "Were you involved in discovery and interrogatories and producing information for plaintiffs' counsel?" To each question, the bookkeeper responded simply, "Yes."

**The Estate's issue:  The South Cross transaction**

In its cross-appeal, the Estate brings a single issue complaining that the probate court erred in rejecting its theory that Phillips breached his fiduciary duties in connection with the sale of certain partnership property in which the Estate had an interest.  In 1993, Phillips; Poulin; his wife, Ruth; other Poulin relatives; and six others formed a partnership for the purpose of acquiring a 9.9-acre tract of raw land at the intersection of William Cannon Drive and Brodie Lane in Austin.  Phillips held a 23% interest in the partnership, Poulin 22.5%, Ruth Poulin 4.5%, Cheryl Poulin 3.3%, Vincent Poulin 1.2%, and the others the remaining 45.5 %.  Phillips and Poulin were designated co-managing partners.

The probate court heard evidence that the partnership's intent was to develop the tract into a commercial shopping center known as South Cross.  A dispute arose between the partnership and the City of Austin concerning the applicability of the impervious cover restrictions of Austin's Save-Our-Springs ordinance in light of a grandfathering permit.  The partnership sued the City, and the parties settled by agreeing that the lots would be subject to the grandfathered impervious cover rules if development began within approximately two years.  The probate court heard evidence that the S.O.S. restrictions, if applicable, would have destroyed much of the tract's value as commercial property.

The tract was divided into nine lots.  Five of the lots were sold before Poulin's death: two to Walgreens, another to Firestone, another to Hollywood Video, and another to Bannockburn Church.  The probate court heard evidence that, as the grandfathering deadline approached, the South Cross partnership faced the dilemma of having to commence construction on the remaining four lots

16

without leases in hand in order to beat the deadline and that, furthermore, lenders would not finance construction unless the partners personally guaranteed the loan. Some of the partners wanted to participate in the deal, which some witnesses termed extremely risky; others did not. Consequently, the required percentage of the South Park partnership voted to sell the property to a new partnership comprised of the original partners who desired to participate in the deal—South Park III.[11] The transaction closed shortly after Poulin's death. Phillips was among the partners in South Park III, holding a 48% interest, and was designated managing partner. The Estate, which had opposed the sale, did not have an interest in the new entity. There was evidence that because of a real estate foreclosure in California, Poulin could not obtain a construction loan or become personally liable for one. Further, Ruth Poulin, the executor of the Estate, did not want to execute a document making her liable for funds.

The Estate alleged that Phillips breached his fiduciary duties in connection with this transaction. It observes that Phillips, as managing partner of the original South Cross partnership, owed his partners fiduciary duties of loyalty that have been termed among the highest duties in law. *See Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex. 1976). Phillips breached this duty, the Estate claimed, by engaging in self-dealing in this transaction—both executing the sale on behalf of the original partnership and the purchase by South Cross III, in his capacities as managing partner of both entities—for his personal gain. Specifically, the Estate contends that the sale price of the property—$1.7 million—was significantly below market value, meaning that the South Cross III

---

[11] Apparently a South Park II partnership had been created in connection with sales of the other lots.

17

partners (including Phillips, who effectively doubled his interest in the property) profited at the expense of the original partners who, like the Estate, were bought out.

In its sole issue, the Estate asserts that Phillips had the burden to establish the fairness of the sale price, and that there is legally and factually insufficient evidence to support the probate court's implied finding that the price was fair. To the contrary, the Estate contends that the only evidence of the property's value indicates that it had been appraised at $2.6 million, almost $1 million over the actual sale price.

Besides disputing the Estate's allocation of the burden of proof,[12] Phillips points to the following evidence regarding the fairness of the sale price:

- The price-per-square foot on the previously-sold South Cross lots had ranged from approximately $8 per square foot for the Walgreens and Firestone lots, to over $13 for the Hollywood Video lot, to $3.45 for the Bannockburn lot. By comparison, the price per square foot for the four lots sold to South Cross III ranged from $9.10 per square foot to $14, or an overall average of $10.49 per square foot.

- Testimony that the most valuable lots on the South Cross tract, in terms of visibility and exposure, were the Walgreens and Firestone lots.

- Testimony that unless construction on the South Cross tract commenced before the grandfathering deadline, the partners—including the Estate—would have been left with property rendered virtually worthless by the S.O.S. impervious cover restrictions.

- Testimony that the partnership could cause construction to commence by the deadline only by (1) beginning construction without leases in hand; and (2) agreeing to be personally liable on the construction loan. Thus, the investment by Phillips and others in South Cross III was considered, in the words of one witness, to have a "catastrophic" level of risk.

---

[12] Phillips argues that he and Poulin were co-managing partners and, therefore, owed the same fiduciary duties to each other. We need not address the proper allocation of the burden of proof here because we conclude that, even if Phillips had the burden to prove the fairness of the sale price, there was sufficient evidence to support the probate court's implied finding that he did so.

In contending that there is nonetheless insufficient evidence that the sale price was fair, the Estate relies on an unsigned loan commitment letter from Mitchell Mortgage Company conditioned on the land value of the property being appraised for at least $2.6 million. There is no direct evidence of whether the land was, in fact, appraised for that value, however. Nor is there proof that Mitchell Mortgage ultimately provided the financing for the project, from which it might have been inferred that an appraisal of the required value had been obtained.

We conclude that the evidence was legally and factually sufficient to support the probate court's implied finding that the sale price of the South Cross property was fair. We overrule the Estate's issue.

We affirm the judgment of the probate court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: October 12, 2007

19