Opinion issued January 30, 2009


 








 






In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-07-00030-CV

____________


THE KROGER COMPANY, Appellant


V.


BETTY SHAW AND ROBERT SHAW, Appellees






On Appeal from the 149th District Court

Brazoria County, Texas

Trial Court Cause No. 16505






MEMORANDUM OPINION

 Appellant, The Kroger Company, appeals from a judgment rendered on a jury
verdict finding them negligent in a premises liability lawsuit filed by appellees, Betty
Shaw and Robert Shaw. In its sole issue, Kroger contends the trial court erred by
denying its motion for judgment notwithstanding the verdict (JNOV), asserting that
there is no evidence to support the jury's finding that it had either actual or
constructive knowledge of the condition of the Mart Cart that caused Betty's fall. 
Because we conclude that the evidence is legally insufficient, we render judgment in
favor of Kroger.

Background 

 Betty was legally blind, having only a ten degree field of vision. She was able
to see perfectly when looking straight ahead, but had no peripheral vision. In
February 2001, Betty entered Kroger's store in Clute, Texas. Betty walked in the
store's secondary, side entrance near the pharmacy. Betty saw a Mart Cart just inside
the side door that she said was "backed in place," ready "to be moved out and go
shopping." Betty boarded the Mart Cart and drove to an air-freshener display. As she
attempted to get off the cart, her left foot caught the Mart Cart's charging cord and
she fell against the store shelving, landing on her knee. When she crawled back to
the cart, Betty noticed the cord tied to the handles of the Mart Cart and a portion of
the cord stacked on the floorboard.

 Drug manager Monique Miller was summoned by another customer to attend
to Betty. Assistant store manager Kendra Carey also soon arrived. Robert, Betty's
husband, was summoned into the store from the parking lot, where he had been
waiting. Later, Betty was helped into her car by a Kroger employee. Betty was
subsequently treated for knee and back injuries.

 Carey completed an internal customer incident report, checking with the
customer service manager, Amy Gilliam, and the opening sacker to see whether they
had known of the problem. Neither the service manager nor the opening sacker had
known of the problem with the cart. Although the Mart Cart's cord reel was
supposed to retract into the rear housing unit to keep the cord out of the way, it was
undisputed that the cord reel on the Mart Cart boarded by Betty was not working at
the time of the accident and that the charging cord was not retracted, but instead was
coiled on the floorboard and tied to the stem of the handlebars.

 Kroger had three Mart Carts, which were rechargeable, electric shopping carts
for the convenience of its infirm and disabled customers. Betty knew of the charging
area where the Mart Carts were normally kept, but said that the cart that she got on
was not in that area. Betty stated that she did not see the cord when she boarded the
Mart Cart, nor did she notice it at any point while driving the cart to her first stop.

 Kroger's employees were trained that if they saw a Mart Cart unattended and
not in the charging area they were to return it to the designated charging area and plug
it in to be recharged. All employees received ongoing training that if they saw
something was out of order, they were to tag it "Out of Order" and to call
engineering. Additionally, the Clute store employed an opening sacker who was
responsible for getting the front of the store ready for business, including inspecting
the Mart Carts, around 6:00 a.m. every morning. There was conflicting testimony as
to whether or not customers or Kroger employees unplugged the Mart Carts before
putting them into use: Betty said that she never unplugged a cart in her twenty years
of Mart Cart use, while Kroger's manager testified that it was always the customer's
responsibility to unplug the carts.

 The jury determined that both Kroger and Betty were negligent, and that their
negligence proximately caused Betty's injuries. The jury found Kroger to be 60
percent responsible and Betty 40 percent responsible. The judgment awarded
damages to Betty and Robert.

Premises Liability

 Kroger contends the trial court erred by denying its motion for JNOV because 
no evidence supports a finding of actual or constructive notice for premises liability.

 A. Standard of Review

 A trial court may disregard a jury's verdict and render a JNOV if no evidence
supports one or more of the jury's findings, or if a directed verdict would have been
proper. Tiller v. McLure, 121 S.W.3d 709, 713 (Tex. 2003); Brown v. Bank of
Galveston, N.A., 963 S.W.2d 511, 513 (Tex. 1998); Williams v. Briscoe, 137 S.W.3d
120, 124 (Tex. App.--Houston [1st Dist.] 2004, no pet.). We view the evidence
under the well-settled standards that govern legal sufficiency, or "no evidence,"
review. See Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709 (Tex. 2003);
Williams, 137 S.W.3d at 124.

 "[L]egal-sufficiency review in the proper light must credit favorable evidence
if reasonable jurors could, and disregard contrary evidence unless reasonable jurors
could not." City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). If the
evidence "would enable reasonable and fair-minded people to differ in their
conclusions, then jurors must be allowed to do so." Id. at 822. "A reviewing court
cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls
within this zone of reasonable disagreement." Id. Although the reviewing court must
"consider evidence in the light most favorable to the verdict, and indulge every
reasonable inference that would support it[,] . . . if the evidence allows of only one
inference, neither jurors nor the reviewing court may disregard it." Id. "The final test
for legal sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review." Id. at 827. 
However, an inference that is stacked only upon other inferences, rather than direct
evidence, is not legally sufficient evidence. See Marathon Corp. v. Pitzner, 106
S.W.3d 724, 728 (Tex. 2003).

 A no-evidence point will be sustained when (a) there is a complete absence of
evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving
weight to the only evidence offered to prove a vital fact, (c) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively
establishes the opposite of the vital fact. King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 751 (Tex. 2003); Heritage Housing Dev., Inc. v. Carr, 199 S.W.3d 560, 565
(Tex. App.--Houston [1st Dist.] 2006, no pet.).

 In claims or defenses supported only by meager circumstantial evidence, the
evidence does not rise above a scintilla, and thus is legally insufficient, if jurors
would have to guess whether a vital fact exists. Keller, 168 S.W.3d at 813. "When
the circumstances are equally consistent with either of two facts, neither fact may be
inferred." Tubelite, A Div. of Indal, Inc. v. Risica & Sons, Inc., 819 S.W.2d 801, 805
(Tex. 1991). In such cases, we must "view each piece of circumstantial evidence, not
in isolation, but in light of all the known circumstances." Lozano v. Lozano, 52
S.W.3d 141, 167 (Tex. 2001).

 Similarly, when injury or death occurs without eyewitnesses and only meager
circumstantial evidence suggests what happened, we cannot disregard other meager
evidence of equally likely causes. See Marathon, 106 S.W.3d at 729. Thus, when the
circumstantial evidence of a vital fact is meager, a reviewing court must consider not
just favorable but all the circumstantial evidence, and competing inferences as well. 
Keller, 168 S.W.3d at 813-14.

 B. Requirements for Premises Liability

 Betty was Kroger's invitee, to whom Kroger owed a duty to exercise
reasonable care to protect her from dangerous store conditions known to or
discoverable by it. Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex.
1998) (citing Rosas v. Buddies Food Store, 518 S.W.2d 534, 536-37 (Tex. 1975)). 
This duty, however, does not make Kroger an insurer of Betty's safety on the
premises. See Gonzalez, 968 S.W.2d at 936. In order to recover from Kroger, the
Shaws must prove: 

(1) Kroger's actual or constructive knowledge of some condition on
the premises, 


(2) the condition posed an unreasonable risk of harm,


(3) Kroger did not exercise reasonable care to reduce or eliminate the
risk, and 


(4) Kroger's failure to use such care proximately caused Betty's
injuries. 


See id. (citing Keetch v. Kroger Co., 845 S.W.2d 262, 264 (Tex. 1992); Corbin v.
Safeway Stores, Inc., 648 S.W.2d 292, 296 (Tex. 1983)). Liability for knowledge of
a potentially harmful condition can be established either by:

(1) proof of actual knowledge--employees caused the harmful
condition or employees either saw or were told of the harmful
condition prior to the plaintiff's injury therefrom; or


(2) proof of constructive notice--the harmful condition was present
for so long that it should have been discovered in the exercise of
reasonable care.


Wright v. Wal-Mart Stores, Inc., 73 S.W.3d 552, 554 (Tex. App.--Houston [1st Dist.]
2002, no pet.) (citing Keetch, 845 S.W.2d at 264); see also Wal-Mart Stores, Inc. v.
Reece, 81 S.W.3d 812, 814 (Tex. 2002) (stating, "A slip-and-fall plaintiff satisfies the
notice element by establishing that (1) the defendant placed the substance on the
floor, (2) the defendant actually knew that the substance was on the floor, or (3) it is
more likely than not that the condition existed long enough to give the premises
owner a reasonable opportunity to discover it.").

 1. Actual Knowledge

 Kroger contends no evidence shows actual knowledge that employees caused
the harmful condition or employees either saw or were told of the harmful condition
before Betty was injured.

 Actual knowledge requires knowledge that the dangerous condition existed at
the time of the accident, as opposed to constructive knowledge which can be
established by facts or inferences that a dangerous condition could develop over time. 
City of Corsicana v. Stewart, 249 S.W.3d 412, 414-15 (Tex. 2008) (citing City of
Dallas v. Thompson, 210 S.W.3d 601, 603 (Tex. 2006)). "Circumstantial evidence
establishes actual knowledge only when it 'either directly or by reasonable inference'
supports that conclusion." Id. at 415 (citing State v. Gonzalez, 82 S.W.3d 322, 330
(Tex. 2002); City of San Antonio v. Rodriguez, 931 S.W.2d 535, 537 (Tex. 1996)).

 The Shaws contend the following evidence shows Kroger's actual knowledge
of the cart's defective condition:

  It is uncontroverted that when Betty boarded the Mart Cart, its
cord retractor was broken and the cord was tied to the cart's
handlebar. 

 

  Monique Miller's statement noted that the cord retractor was
broken and the cord was tied to the handlebar.

 

  Defendants Exhibits 1 and 2 show the Mart Cart with the cord
tied to the stem of the handlebars.

 

Although the Shaws contend this evidence shows that Kroger had actual knowledge
of the condition, none of this evidence pertains to knowledge of the condition. This
evidence shows only that the Mart Cart's cord was visibly broken, but it does not
show that Kroger had actual knowledge of the condition of the cord.

 The Shaws also point to testimony by Bob Janik, Kroger's manager, but his
testimony is not pertinent to whether Kroger had knowledge about the condition of
the cart Betty rode. Janik stated, "[W]e park [the Mart Carts] in the front end, back
them up, and keep them plugged in in the same spot everyday." However, it is
undisputed that the Mart Cart that Betty boarded was not in its proper location where
the carts are plugged in for recharging. Carey testified that the Mart Carts were
normally kept at the main entrance, not in the pharmacy entrance where Betty found
her Mart Cart. Betty acknowledged that she knew of the charging location at the
store, "but that's not where the cart was that [she] got on."

 The Shaws assert that an employee must have been the one who wrapped the 
cord around the handle bars and who left the cart in the "backed in" position near the
pharmacy door. However, the only evidence that might support this assertion is
Betty's opinion that is based on speculation about the habits of others. Betty said that
she did not think a Kroger customer would back the cart into place and wrap the cord
around the handlebar, and that was something she believed only a Kroger employee
would do. Betty's opinion contradicts her own testimony that her husband would
leave the carts near the door to the store. Betty's unfounded opinion based on
speculation is no evidence that Kroger employees left the Mart Cart where Betty
found it. See Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227,
232 (Tex. 2004) (noting opinion testimony that is speculative is "incompetent
evidence" and cannot support a judgment) (citing Tex. R. Evid. 401). 

 Our decision turns on whether Assistant Store Manager Carey's testimony
suggesting that customers probably left the Mart Carts they drove outside the store
and Kroger employees would then probably be the ones to bring those carts into the
store is some evidence that the cart found by Betty was probably left there by a
Kroger employee. We begin by noting that Betty's own testimony disputes this
assertion. Betty testified,

 [Kroger's Attorney] Okay. When you finished using the Mart Cart
before this [the day of the injury], where
would you - - or how would you return the
Mart Cart?


 [Betty] I would drive out to the sidewalk. My
husband would drive the car up and get out
and put the groceries in the cart, then he
would drive the Mart Cart back in the store.


 [Kroger's Attorney] Okay. And do you know where he would put
it?


 [Betty] No.


 [Kroger's Attorney] Do you know if he took it to the charging area
or if he just put it right inside the door like the
other customers?


 [Betty] He never put it in the charging area I don't
think. I don't know anybody that ever has
done that.


 [Kroger's Attorney] So, you think that when people finish using
the Mart Cart they drive it maybe inside the
door and just set it there?


 [Betty] They move it aside, yeah.


 [Kroger's Attorney] Okay. Right by the door, right where you
used this Mart Cart?


 [Betty] Uh-huh.


 [Kroger's Attorney] Right?


 [Betty] (Witness nods head).


 Although Betty claims her husband would return the Mart Cart into the store,
Carey testified that most customers did not. Carey testified that customers would
probably leave the Mart Carts in the parking lots when they were done using them,
which would then require a Kroger employee to move the cart into the store. The
record shows:

 [Shaws'Attorney] But you know that as the testimony was earlier, I
think it was from your counsel, she doesn't return
carts to the inside. And most customers that use the
cart and if they take it outside, a customer's not
going to ride that all the way back in if they're using
the cart, are they?

 

 [Carey] Most of them don't. You're right sir.

 

 [Shaws'Attorney] That's right. And so, it's more likely than not that it
wasn't a customer that rode this thing back in and
parked it in the main entrance that way, is it?

 

 . . . .

 

 [Carey] Probably yes.


 . . . .

 

 [Shaws'Attorney] Okay. Well, in this particular instance, wouldn't you
agree with me that it is more probable than not that
if you have a lazy person or an infirmed [sic] person
who has to use one of these carts, that if they take
the cart out to their vehicle to unload their groceries
that they're not likely to drive it all the way back so
they have to walk back to their car?


 . . . .

 

 [Carey] As I said before, it is more likely than not.


 We must determine whether evidence that customers would leave Mart Carts 
outside more often than not and that Kroger employees would then bring those carts
into the store is some evidence to establish that Kroger knew the cart with the broken
cord was left by the front door. Evidence establishes actual knowledge only when it
"either directly or by reasonable inference" supports that conclusion. Gonzalez, 82
S.W.3d at 330. No evidence shows that the Mart Cart Betty rode had been outside
the store at any time before Betty rode it. There was no evidence about how or when
the Mart Cart driven by Betty came to rest where she found it. Because no evidence
shows that this Mart Cart had been outside the store on the day Betty was injured, the
inference that Kroger employees were the likely people to bring carts from outside
into the inside is immaterial. Therefore, even if Kroger employees would probably
bring carts left outside of the store into the store, that fact has no bearing on whether
this cart was left where Betty found it. 

 Even if we assume that the evidence supports an inference that the cart was
returned to the store by a Kroger employee, that inference does not support the
inference that the Kroger employee left the cart used by Betty near the side door. We
must consider not just favorable evidence but all the circumstantial evidence, and
competing inferences as well, when the plaintiff's case is based on meager
circumstantial evidence. Keller, 168 S.W.3d at 813-14. Kroger employees were
trained that whenever they saw an unattended Mart Cart, they were to return it to the
designated charging area and plug it in to charge. Employees who drove the carts
back were also responsible for inspecting them; if they found something wrong they
were to tag the cart out of order and then either they would call or a manager would
call facility engineering to come repair it. Kroger also employed an opening sacker
who was responsible for inspecting the Mart Carts, while readying the front of the
store for business around 6:00 a.m. every morning. Assuming the evidence suggests
the inference that employees brought carts from outside to inside, the evidence does
not support the next inference that the employee left the cart used by Betty in the
damaged condition because the evidence in the record shows employees were trained
to tag a broken cart and send notice that it needed to be repaired. We hold the
evidence is legally insufficient to prove that Kroger had actual knowledge of the
harmful condition under the theory that an employee left the Mart Cart at the place
where Betty found it. 

 For the same reasons the evidence is legally insufficient to show that a Kroger
employee left the cart where Betty found it, the evidence is legally insufficient to
show that Kroger had actual knowledge of the Mart Cart's condition under the theory
that employees either saw or were told of the Mart Cart's condition before Betty took
it. See Wright, 73 S.W.3d at 554; see also Reece, 81 S.W.3d at 814. No evidence
was presented that anyone told Kroger or any of its employees of the condition of the
Mart Cart, and no evidence was presented that any employee was aware of the
condition of the Mart Cart before Betty fell. The evidence is legally insufficient to
show that any employee was aware of the Mart Cart's condition prior to Betty's
injuries. No evidence, therefore, establishes that Kroger had actual knowledge of the
Mart Cart's condition before Betty fell.

 2. Constructive Notice

 The evidence is also legally insufficient to prove that Kroger had constructive
knowledge, because no evidence shows that the Mart Cart was in the dangerous
condition long enough to give Kroger a reasonable opportunity to discover the
condition. 

 In the context of premises liability, to prove constructive notice, the evidence
must establish that it is more likely than not that the dangerous condition existed long
enough to give the proprietor a reasonable opportunity to discover the condition. 
Gonzalez, 968 S.W.2d at 936. The rule requiring proof that a dangerous condition
existed for some length of time before a premises owner may be charged with
constructive notice is firmly rooted in the state's jurisprudence. Brookshire Grocery
Co. v. Taylor, 222 S.W.3d 406, 409 (Tex. 2006); see Bendigo v. City of Houston, 178
S.W.3d 112, 114 (Tex. App.--Houston [1st Dist.] 2005, no pet.); Wright, 73 S.W.3d
at 554.

 No evidence shows when the Mart Cart's charging cord stopped retracting or
what caused it to stop retracting. No evidence shows the length of time the Mart Cart
was located by the pharmacy entrance before Betty found it. We conclude no
evidence shows that the harmful condition was present for so long that it should have
been discovered in the exercise of reasonable care. See Reece, 81 S.W.3d at 814. The Shaws contend we should apply the rule articulated in Corbin. Corbin,
648 S.W.2d at 295. In Corbin, the Supreme Court of Texas held that "evidence that
a proximate cause of the fall was the storeowner's failure to use reasonable care to
protect its customers from the known and unusually high risks accompanying
customer usage of a self-service display of goods . . . establishes a right to have a jury
determine the storeowner's liability, even in the absence of evidence showing the
storeowner's actual or constructive knowledge of the presence on the floor of the
specific object causing the fall." Id. The court explained its holding by noting that
"Safeway acknowledged its full awareness of every circumstance under which it
operated the self-service grape display, but contended a walk-off mat was in place at
the time Corbin fell." Id. at 296. The court determined the requirement of notice to
Safeway was satisfied by the employee's failure to put the mat in place because "the
placing of such a mat in front of the grape display was a function of general store
maintenance." Id. However, the court clarified that it was not imposing liability for
"the failure to comply with a company policy." Id. at 298. The court stated, "If
reasonable store conduct includes the use of mats or other floor coverings or even
warnings in front if a particular display, then Safeway may be held liable for not using
them, regardless of whether company policy requires them." Id. The court concluded
that its holding was consistent with "[m]any states [that] now recognize that a store
keeper may be held liable for any dangerous premises condition about which he
should be aware, not just for specific objects left on the floor by customers." Id.

 The Shaws contend Corbin requires a finding that Kroger had notice of the
cord's condition because the manual for the Mart Cart required daily inspection of the
cord and that this type of inspection would have revealed its broken condition, which
would have prevented this fall by Betty. Unlike Corbin, here no evidence shows that
the problem with the cord was a "known and unusually high" risk, so that "even in
the absence of evidence showing the storeowner's actual or constructive knowledge"
of the broken cord, Kroger had notice of the condition. See id. at 295. Although
Kroger did not abide by the specific inspection requirement stated in the manual for
the Mart Cart, we cannot impose liability "for failure to comply with company
policy." See id. at 298. Moereover, the record shows Kroger complied with its policy
to have the opening sacker inspect the carts every morning. Because no evidence
shows the cord was a known risk, Corbin is inapplicable. See id. at 295.

 We hold the evidence is legally insufficient to support the jury's finding that
Kroger had either actual or constructive knowledge of the condition of the Mart Cart
that caused Betty's fall. We therefore sustain Kroger's sole issue that the trial court
erred in denying Kroger's motion for judgment notwithstanding the verdict.

Conclusion

 We reverse the judgment of the trial court and render a take-nothing judgment
against appellees, Betty and Robert Shaw.


 

 Elsa Alcala

 Justice


Panel consists of Chief Justice Radack and Justices Alcala and Hanks.