Opinion issued June 2, 2011



In The

Court
of Appeals

For The

First
District of Texas

————————————

NO. 01-09-00622‑CV

———————————

GSF Energy, LLC, Appellant

V.

Herlinda Padron, Individually
and as Heir at Law of Adan Padron, Deceased, and as Next Friend of Adam Padron,
Fernando Padron, Arturo Padron, and Hector Padron, Minors; and Tayna Padron, Appellees



 



 

On Appeal
from the 164th District Court

Harris
County, Texas



Trial Court Case No. 2006‑29506

 



 

 

OPINION ON REHEARING

          Both
appellant and appellees have filed motions for rehearing.  Appellees have also filed a motion for en
banc reconsideration.  We grant
rehearing, withdraw our previous opinion, deny appellant’s and appellees’ requested
relief, and dismiss as moot the motion for en banc reconsideration.[1] Our
judgment of February 10, 2011 remains unchanged.

          This appeal arises out of
the death of Adan Padron, who was killed when debris fell on him while he was
cleaning the inside of a processing‑plant tank.  Padron’s wife and children sued the plant
operator and Padron’s employer for negligence and premises liability.[2]  We
must decide whether the plant operator exercised or retained control
over the manner in which Padron’s employer, an independent contractor, performed
its work such that the plant operator can be liable for Padron’s death.  In addition, we must determine whether the
trial court erred in submitting the jury charge.  We reverse the trial court’s judgment and
remand the case for further proceedings.

Background

          Appellant
GSF Energy, LLC operates a landfill-gas processing plant on McCarty Road in
Houston.  The plant gathered gas produced
from wells drilled into a landfill owned by BFI and processed the landfill gas
into saleable natural gas.  The components
of the plant had been previously used as a plant at a landfill in California
before being moved to McCarty Road.  There was conflicting testimony at trial
regarding whether the components of the plant were owned by GSF or LFG
Management Services, L.L.C.

          On
a daily basis, the plant takes in about 9 million cubic feet of landfill gas
and produces about 4 million cubic feet of saleable natural gas.  As part of the gas processing, the landfill
gas is filtered through a pressurized tank filled with “iron sponge.”  The tank is about 15 feet tall.  Iron sponge is made up of wood chips impregnated
with iron oxide, and it removes hydrogen
sulfide from the landfill gas.  Over
time, iron sponge becomes spent and no longer removes hydrogen sulfide from the gas
passing through the tank.  The iron
sponge must then be replaced, generally two to three times per year.  The iron sponge clumps together into hard
pieces and sometimes adheres to the walls of the tanks.  GSF has known since 1986 that iron sponge
adheres to the walls of the tanks.  The
McCarty Road plant has two iron-sponge tanks, or vessels, which are known as
V321A and V321B.  The accident that
killed Adan Padron occurred in V321B.

          Beginning
in 2001, GSF hired CES Environmental Services to periodically come to the plant
to clean out the iron-sponge tanks.  CES’s
employees would clean one of two tanks, while the other tank remained in
operation.  CES’s employees cleaned the tanks
by “hydroblasting” the inside of the tank with high‑pressure water.  They would climb on top of the tank and spray
down into the tank through a “manway” that had been unbolted and removed.  The hydroblasting breaks up the iron sponge,
which is then vacuumed out through a hose.

          On
February 16, 2005, three CES employees, Adan Padron, José Ramirez, and Joe
Carrillo, went to the McCarty Road plant to clean V321B.  The last time that V321B had been cleaned was
a year before.  Carrillo received a “general
and hazardous safety work permit” from James Jannise, who is an “operator” for
GSF.  Part of Jannise’s job is to assist
with filling the iron–sponge tanks.  The
purpose of the permit was to ensure that GSF had properly shut down the tank so
the area would be safe to work in, and it was required to be issued as a part
of GSF’s work permit program.  Michael
Sawyer, an independent process safety consultant, testified at trial that GSF’s
work permit indicated that only two of the four valves on the tank had been
closed, which was improper.

          Padron,
Ramirez, and Carrillo spent four days hydroblasting the tank from the top.  On February 21, Carrillo told Jannise that
there was still some iron sponge they had not been able to remove through
hydroblasting and that “we had to make tank entry” in order to remove the
remainder.  The next morning, Jannise
told Carrillo that he had talked to Gary Valdez, the GSF McCarty Road plant
manager, and that Valdez wanted the tank fully cleaned out.  Valdez then came out to the tank and Carrillo told
him that the hydroblasting was not working. 
At trial, Carrillo testified that Valdez never told him that the CES
employees had to go inside the tank from the bottom, but he was impeached with
his prior deposition testimony in which Carrillo said Valdez directed CES to
carry out the work by having workers enter the tank.  During his deposition, Carrillo stated he
felt that he could not say “no” to Valdez.  Valdez acknowledged he had a conversation
with Carrillo about entering the tank to clean it, but Valdez did not testify
that he told Carrillo to enter.

          Carrillo
testified that Valdez told him what tools and equipment they would need to work
inside the tank.  Carrillo said that
Valdez told him to use nonsparking, brass tools so the CES workers would not create
a spark that could accidentally ignite the combustible atmosphere inside the
tank.  Marlin Moser, a CES vice president,
also told Carrillo to use brass tools.  Because
the CES workers were entering the tank, Valdez expanded the project by telling Carrillo
to remove river rock and a broken screen from the bottom of the tank.  Valdez then called CES’s president, Matt
Bowman, and discussed the need to enter the tank, and Bowman said he would send
a “six‑pack” of breathing air out to the plant.

          GSF’s
work permit program required a “confined space safety work permit” to be issued
before anyone entered the tank.  Valdez
testified that the CES workers could not enter the tank until he approved such
a permit.  Carrillo filled out a CES
confined-space entry permit authorizing entry into the tank.  The preprinted language of the permit stated,
“Entry cannot be approved if any squares are marked in the ‘No’ column.”  Even though two boxes were checked “no,”
indicating the absence of required communications equipment and other safety
equipment, Valdez nonetheless approved the permit.

          Carrillo
and Padron entered the tank and took turns using the pick to break the iron
sponge into chunks, while the other person used a shovel to pile the debris
into a pile to be vacuumed out.  Carrillo
testified that he had never before used a pick or shovel to clean iron sponge
out of a tank and that the sponge in the tank was as “hard as a rock.”  Within 15 to 30 minutes of their entering the
tank, a huge chunk of iron sponge fell, hit the ladder, and bounced off and hit
Padron.  Carrillo tried to lift the
sponge, but it was too heavy.

          After
Carrillo was pulled from the tank, he called Moser, who went to the McCarty
Road plant.  Moser and Ramirez entered
the tank and used an axe to break up the iron sponge that had fallen on Padron,
who was then taken in an ambulance to the hospital.  Padron was later pronounced dead, and an
autopsy determined that the cause of death was blunt‑force injuries to
the head and neck.

          Moser
was asked for his explanation of why the iron sponge fell from the tank’s roof.
 Moser testified without objection as to
hearsay that Carrillo told him the following:

          They - - they - - they were in there working, and had only
been been in the tank - - I don’t know. Maybe 20 minutes or so, and they were
having trouble getting it off because it didn’t - - it wasn’t coming off for
them easy, and there was a lot that was stuck to the walls to get off.

          So they were getting kind of frustrated with what they were
doing, so, you know - - [Padron] was probably the best worker in the
company.  I mean, he was a - - he was a
work horse.  He - - he - - he was - - you
know, he was - - everybody wanted to work with him because he was the guy that
got the job done all the time.  Well, he
- - he took the brass pick, and he wound up - - and he slammed it against the
tank as hard as he could, and it stuck in the side of the tank, and - - but it
started knocking - - the - - the - - the vibration started knocking stuff down,
but - - and I guess it kind of scared the hell out of Carrillo.

          So
[Padron], when he pulled it out of there - - because he was shaking the tank
pulling it out of there because he could barely get it off the wall.  They were both in supplied air, and
[Carrillo] - - [Carrillo] was yelling to him “Don’t - - don’t - - don’t do that
again.  Don’t do that again.”  And he hauled off and hit it the second time,
and when he hit it the second time, that’s when the stuff just came loose from
the top.

None of Carrillo’s oral or written statements corroborates
Moser’s testimony.

          Adan Padron’s
wife, Herlinda Padron, sued GSF, individually and as next friend for her four
minor children Adam, Fernando, Arturo, and Hector Padron, for negligence and
premises liability.  Adan Padron’s adult
daughter, Tayna Padron, also filed a plea in intervention.  The case was submitted to the jury based only
on negligence.  In its verdict, the jury
found that (1) GSF exercised or retained some control over the manner in which
CES’s work was performed, (2) GSF’s and CES’s negligence proximately caused
Padron’s death, (3) GSF’s negligence was 60% and CES’s negligence was 40%, (4)
Herlinda’s past pecuniary loss was $155,185, future pecuniary loss will be
$858,044, past mental anguish and loss of companionship was $500,000, and
future mental anguish and loss of companionship will be $1,500,000, (5) Adam
Padron’s past mental anguish and loss of companionship was $500,000 and future
mental anguish and loss of companionship will be $1,000,000, (6) Fernando
Padron’s past mental anguish and loss of companionship was $500,000 and future
mental anguish and loss of companionship will be $1,000,000, (7) Arturo
Padron’s past mental anguish and loss of companionship was $500,000 and future
mental anguish and loss of companionship will be $1,000,000, (8) Hector
Padron’s past mental anguish and loss of companionship was $500,000 and future
mental anguish and loss of companionship will be $1,000,000, and (9) Tayna
Padron’s past mental anguish and loss of companionship was $250,000 and future
mental anguish and loss of companionship will be $500,000.  The trial court rendered judgment on the
verdict against GSF.

Analysis

Legal
sufficiency 

          In its first issue, GSF
claims the evidence is legally insufficient to support the jury’s finding that
GSF exercised or
retained some control over the manner in which CES’s work was performed.  Our review of the legal sufficiency
of the evidence must consider the evidence in the light most favorable to the
fact-finder’s decision and indulge every reasonable inference in support of
that decision.  See City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex.
2005).  If the party attacking the legal
sufficiency had the burden of proof on that issue, it must demonstrate that the
evidence establishes all vital facts in support of that issue as a matter of
law.  Dow Chem. Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001).  As the
reviewing court, we need first search the record for evidence that supports the
finding and disregard all evidence to the contrary.  Id. 
Absent evidence supportive of the finding, we then examine the entire
record to determine if the contrary proposition was established as a matter of
law and, if established conclusively, the issue must be sustained.  Id. at 241–42.

            Generally, a general contractor does
not have a duty to see that a subcontractor performs work in a safe
manner.  Abarca v. Scott Morgan Residential, Inc., 305 S.W.3d 110, 126 (Tex.
App.—Houston [1st Dist.] 2009, pet. denied) (citing Redinger v. Living, Inc.,
689 S.W.2d 415, 418 (Tex. 1985)). 
However, a limited duty arises if a general contractor retains control
over a subcontractor’s methods of work or operative details to the point that
the subcontractor is not entirely free to do the work in his own way.  Abarca,
305 S.W.3d at 126 (citing Koch Refining Co. v. Chapa, 11 S.W.3d
153, 154 (Tex. 1999)).  The general
contractor’s “duty of reasonable care is commensurate with the control it
retains” over the subcontractor.  Hoechst-Celanese
Corp. v. Mendez, 967 S.W.2d 354, 355 (Tex. 1998).  General supervisory control that does not
relate to the activity causing the injury is not sufficient to create a
duty.  Abarca, 305 S.W.3d at 126.  However,
“an employer who gives on-site orders or provides detailed instructions on the
means or methods to carry out a work order owes the independent contractor
employee a duty of reasonable care to protect him from work-related
hazards.”  Hoescht-Celanese, 967
S.W.2d at 357.

          Control can be established in two
ways: by (1) a contractual right of control or (2) an exercise of actual
control.  Abarca, 305 S.W.3d at 122 (citing Dow Chem. Co. v. Bright,
89 S.W.3d 602, 606 (Tex. 2002)).  In this
appeal, the only issue contested by all parties is that GSF exercised actual
control.  To be liable because it exercised
actual control, GSF must have had the right to control the means, methods, or
details of the independent contractor’s work to the extent that the independent
contractor was not entirely free to do the work his own way.  See Abarca,
305 S.W.3d at 124 (citing Ellwood Tex. Forge Corp. v. Jones, 214 S.W.3d 693, 700 (Tex.
App.—Houston [14th Dist.] 2007, pet. denied)).  The control must relate to the injury the
negligence causes.  Abarca, 305 S.W.3d at 124. 
It is not enough that the owner has the right to order the work to stop
and start or to inspect progress or receive reports.  Id. 
Nor is it enough to recommend a safe manner for the independent
contractor’s employees to perform the work. 
Id.

          Although
there was conflicting evidence concerning whether GSF exercised actual control
over the decision to enter the tank and remove the remaining iron sponge, there
was evidence to support the jury’s finding. 
Carrillo testified
in his deposition, which was admitted at trial, that Valdez gave him directions
on how to carry out the work by entering the tank and that he felt that he
could not say “no” to Valdez.  Carrillo
testified that both Valdez and Moser told him to use nonsparking, brass tools.  Valdez also expanded the project by telling
Carrillo to remove river rock and a broken screen from the bottom of the tank.  Valdez approved the confined-space entry
permit that authorized entry into the tank. 
Valdez testified that the CES workers could not enter the tank until he
approved such a permit, and he acknowledged that he approved the permit
notwithstanding the fact that the permit had two boxes checked “no” and the
preprinted language of the permit states, “Entry cannot be approved if any
squares are marked in the ‘No’ column.”

          GSF argues that Valdez’s approval of the confined-space
entry permit is only some evidence that GSF did not follow its safety policies
and that it is not evidence of GSF’s control.  As an example, GSF points to the Texas
Supreme Court’s opinion in Lee Lewis
Construction, Inc. v. Harrison, in which the court held that evidence of a
general contractor’s inspection of the independent contractor’s fall‑protection
equipment was some evidence that the general contractor retained a right to
control.  70 S.W.3d 778, 784 (Tex.
2001).  We disagree.  Valdez’s own testimony was that the CES
workers could not enter the tank until he approved a permit and that he had
specific discussions with CES workers about how to carry on once inside the
tank.

          GSF further
argues that its actions do not relate to the injury‑causing activity,
which GSF identifies as Padron’s alleged decision to “slam his pick axe a
second time into the side of the tank.” 
In doing so, GSF reads the duty of reasonable care that can arise to
protect an independent contractor employee from work-related hazards too
narrowly.  See Hoescht‑Celanese, 967 S.W.2d at 357.  Here, Valdez suggested the tools used—nonsparking,
brass pick axes—and approved entry to a 15‑foot‑tall tank that had
iron sponge adhering to its walls.  GSF
was aware through its employee, Valdez, of what the CES workers would be doing
inside the tank, i.e., using force to remove iron sponge.  We hold that a reasonable jury could conclude
that GSF retained control related to the injury‑producing event.

          Similarly,
in its second issue GSF claims the evidence is legally insufficient to support
the jury’s finding that GSF’s
negligence proximately caused Padron’s death. 
In a negligence action, a plaintiff must show that (1) the defendant
owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the
breach proximately caused the plaintiff’s injuries.  D. Houston, Inc. v. Love, 92 S.W.3d
450, 454 (Tex. 2002).  Proximate cause
requires proof of both cause in fact and foreseeability.  W. Invs.,
Inc. v. Urena, 162 S.W.3d 547, 551 (Tex. 2005).  The test for cause in fact is whether the act
or omission was a substantial factor in causing the injury without which the
harm would not have occurred.[3]  Id.
(citing Marathon Corp. v. Pitzner,
106 S.W.3d 724, 727 (Tex. 2003)).

          GSF again
argues that its actions do not relate to the injury‑causing activity,
which GSF generally identifies as CES’s work in cleaning out the tank and
specifically identifies as Padron’s alleged decision to slam his pick axe twice
into the side of the tank.  In its brief,
GSF sums up its argument by stating, “By merely allowing Carrillo and Padron to
enter the vessel and complete their job, GSF Energy did not cause the
accident.”  The jury, however, in its
answer to question 1 found that GSF exercised or retained control over the
manner in which CES’s work was performed, and there is more than a mere scintilla
of evidence to support this finding. 
Consequently, we do not agree that the evidence supports a
characterization that GSF “merely” allowed Carrillo and Padron to enter the
vessel and complete their job.  Rather, the
record demonstrates that GSF not only permitted entry into the tank from the
bottom, but was aware of the dangers of removing sponge and, through its
employee Valdez, approved nonsparking brass pick axes to remove the sponge from
the confined interior of the tank.  GSF
does not dispute that the accident was caused by the use of a pick axe inside
the tank.  Accordingly, we conclude there
is more than a mere scintilla of evidence to support the jury’s finding that GSF’s negligence proximately
caused Padron’s death.

          We overrule
the first and second issues concerning legal insufficiency of the evidence.

Charge error

          In its fifth
issue, GSF contends the trial court erred in refusing to submit questions in
the charge on Padron’s negligence.  GSF
argues, and we agree, that the following testimony raises the question of
Padron’s negligence:

          Well, he - - he took the brass pick,
and he wound up - - and he slammed it against the tank as hard as he could, and
it stuck in the side of the tank, and - - but it started knocking - - the - -
the - - the vibration started knocking stuff down, but - - and I guess it kind
of scared the hell out of Carrillo.

          So
[Padron], when he pulled it out of there - - because he was shaking the tank
pulling it out of there because he could barely get it off the wall.  They were both in supplied air, and
[Carrillo] - - [Carrillo] was yelling to him “Don’t - - don’t - - don’t do that
again.  Don’t do that again.”  And he hauled off and hit it the second time,
and when he hit it the second time, that’s when the stuff just came loose from
the top.

A trial court may refuse to submit a question only if no
evidence exists to warrant its submission. 
Elbaor v. Smith, 845 S.W.2d
240, 243 (Tex. 1992); Tex. R. Civ. P.
278.  GSF requested, and the trial court refused,
a contributory‑negligence issue.

          Appellees
contend that the trial court properly refused to submit questions in the charge
on Padron’s negligence because there was no expert testimony submitted requiring
Padron’s alleged negligence.  We
disagree.  The evidence that supports the
submission of the questions is that when Padron first struck the iron sponge on
the tank, the vibration “started knocking stuff down.”  Under those circumstances, it would be within
the “common knowledge of laymen” that hitting the iron sponge again might cause
further portions of the sponge to fall.  See FFE
Transp. Servs. v. Fulgham, 154 S.W.3d 84, 89–90 (Tex. 2004).[4]

          We sustain
GSF’s fifth issue.  Because reversal
based on an improper submission of the charge requires a remand for new trial,
we do not reach the remaining issues, none of which entitles GSF to rendition.[5]

Conclusion

          The
judgment of the trial court is reversed, and the case is remanded for further
proceedings.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and Bland.

 











[1]          See Brookshire
Bros., Inc. v. Smith, 176 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.]
2004, pet. denied).

 





[2]          The appellees are Herlinda Padron, individually and as
heir at law of Adan Padron, deceased, and as next friend of Adam Padron,
Fernando Padron, Arturo Padron, and Hector Padron, minors; and Tayna Padron.





[3]          GSF does not argue the foreseeability element of
proximate cause in issue two.





[4]        On
rehearing, Herlinda Padron contends that
GSF did not raise an argument at the charge conference that a comparative‑responsibility
issue should be submitted based on Moser’s unobjected‑to hearsay
testimony concerning Carrillo’s statement to Padron.  See
Tex. R. Evid. 802 (“Inadmissible
hearsay admitted without objection shall not be denied probative value merely
because it is hearsay.”).  Instead,
Herlinda Padron contends that the only evidence GSF raised was that Padron did
not use a light to inspect the vessel. 
This is incorrect.  This argument
was raised below.  Moser was the last
witness to testify at trial, and the trial court referred to Moser’s testimony
during the charge conference when asked to submit a comparative‑responsibility
issue: “I get the point.  I - - where I’m
trying to remember is - - I remember the
comment at the end, but outside of that, where is the rest that even
broaches the subject of Padron having something to do with this?”  (Emphasis added).

 





[5]           These
issues are: the trial court erred in refusing to submit an instruction in the
charges concerning Civil Practice and Remedies Code chapter 95 (issue 3); the
evidence is factually insufficient to support the jury’s findings concerning
control and proximate cause (issue 4); the evidence is factually insufficient
to support the jury’s findings concerning loss‑of‑companionship and
mental‑anguish damages (issue 6); and the trial court erred in holding
GSF jointly and severally liable.  See Tex.
Civ. Prac. & Rem. Code Ann. §§
95.001–.004 (West 2005).  GSF states in
its appellate brief that the remedy for the trial court’s refusal to submit a
chapter 95 instruction is for this Court to render a take‑nothing
judgment.  We are not aware of any
authority that would allow an appellate court to render judgment based solely
on the trial court’s error in submitting an incorrect charge.